57 A.3d 484

**Ramiro Arce GONZALEZ**

v.

**STATE of Maryland.**

**No. 4, Sept. Term, 2012.**

Court of Appeals of Maryland.

Dec. 20, 2012.

634

Juan P. Reyes, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Office of the Public Defender, Baltimore, MD), on brief, for petitioner.

Todd W. Hesel, Honors Atty. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BARBERA, J.

It is settled that, before conducting a custodial interrogation, the police must comply with the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* requires the police to advise the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479, 86 S.Ct. 1602. Only if the suspect, upon receiving valid warnings, makes a knowing, intelligent, and voluntary waiver of the rights embodied in the warnings may the police question the suspect. *Id.* at 478–79, 86 S.Ct. 1602. In the present case, we must decide whether the police complied with both the "warnings" and "waiver" requirements of *Miranda* before interrogating Petitioner, Ramiro Arce Gonzalez.

Petitioner is a Mexican immigrant who does not speak or comprehend the English language. His native language is Mixtec, an indigenous language spoken in a particular region of Mexico.[1] The police arrested Petitioner in connection with a murder. Through a state trooper who used a combination of Spanish and, in explaining the words "court" and "attorney," Mixtec, the police issued the *Miranda* warnings and received Petitioner's waiver of the rights embodied in those warnings. The same state trooper acted as the interpreter during the subsequent interrogation, which was conducted entirely in

---

1. The words Mixtec and Mixteco are used interchangeably in the record. Petitioner advises us that Mixteco is the Spanish word for Mixtec, and Mixtec is the language spoken by the indigenous people inhabiting the La Mixteca region of Mexico, which includes the states of Oaxaca, Guerrero, and Puebla. The Mixtec language has at least two sub-dialects, Mixtec Bajo and Mixtec Alto. Petitioner speaks Mixtec Alto.

Spanish. During the interrogation Petitioner made a statement connecting him to the murder.

Before trial, Petitioner sought suppression of the statement on the grounds that he did not receive proper *Miranda* warnings and, consequently, was unable to make a knowing, intelligent, and voluntary waiver of the rights addressed in those warnings. The suppression court denied the motion. Petitioner's statement to the police was admitted into evidence at trial, and he was convicted of first degree murder and related offenses.

On appeal to the Court of Special Appeals, Petitioner argued, among other claims of error, that the State failed to prove that he was properly advised of, and validly waived, the *Miranda* rights. A panel of the Court of Special Appeals issued an unreported opinion holding that the record developed at the suppression hearing sufficed to permit the court to rule that the *Miranda* warnings and Petitioner's waiver complied with constitutional dictates. For the reasons that follow, we agree with the Court of Special Appeals.

I.

The trial that led to Petitioner's conviction for first degree premeditated murder was conducted over three days in October 2009. The crime, however, had occurred four years earlier.[2]

The record discloses that, on the night of October 15, 2005, the victim, Cheryl Williams, joined Petitioner and his acquaintance, Rutilio Melo, in a minivan. Melo drove the minivan to a site near a wooded area of Princess Anne, Somerset County, where Williams later was murdered.

---

2. The record reflects that in 2006 Petitioner entered an *Alford* plea, named for the case of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and received a life sentence, no part of it suspended, on the charge of first degree premeditated murder. Petitioner later sought and received postconviction relief in the form of vacation of the plea. The reasons for that relief are not pertinent to the present case.

Investigation of the crime led the police soon to focus on Melo. The police arrested and interviewed Melo, who, like Petitioner, speaks the dialect Mixtec Alto. Melo, with Trooper Ed Torres interpreting in Spanish, implicated Petitioner in the murder. Within hours, the police arrested Petitioner. With Trooper Torres interpreting in Spanish, Petitioner made a statement to the police. In that statement Petitioner admitted that he accompanied Melo to the site where he, Petitioner, had sexual intercourse with the victim; Melo used a car jack to bludgeon the victim to death; and he, Petitioner, assisted Melo in moving the body further into a wooded area and then disposing of the murder weapon. Petitioner later filed a motion to suppress that statement.

### The suppression hearing [3]

A suppression hearing was held to determine the admissibility of the statement Petitioner made during the police interrogation. Detective Sergeant George Nelson, the lead investigator, described the interrogation, which took place at the Princess Anne State Police Barrack. Detective Nelson testified that Trooper Torres issued Petitioner the *Miranda* warnings in Spanish, using a Maryland State Police (MSP) 180 form. That process consumed 22 minutes and was not recorded. Detective Nelson then conducted the interrogation, with Trooper Torres interpreting for Petitioner, in Spanish. Pursuant to his usual practice, Detective Nelson first conducted what he called a "pre-interview" to determine whether Petitioner had any valuable information; that pre-interview likewise was not recorded. After the pre-interview, Detective Nelson and Trooper Torres left the room. They returned several hours later to conduct a second interrogation of Petitioner, which was recorded on audiotape.[4]

---

**3.** An interpreter provided simultaneous Mixtec Alto interpretation throughout the hearing.

**4.** Detective Nelson testified that the interrogation was conducted in a room typically used for that purpose, both he and Trooper Torres were in street clothes, and neither was carrying a weapon. Petitioner was

Detective Nelson testified to his observations of how Petitioner comprehended what was being interpreted in Spanish during the issuance of the *Miranda* warnings and subsequent interrogation:

> [Petitioner] would shrug his shoulders, shake his head. Sometimes he would say si. Even prior to Trooper Torres finishing his question, the responses were, in most instances, normal, almost immediate. There wasn't a pause like he was trying to figure out what Trooper Torres was saying. I didn't see a problem. If I did, I wouldn't have continued.

Trooper Torres also testified at the hearing. Much of his testimony focused on his issuance of the *Miranda* warnings to Petitioner, Petitioner's waiver of the *Miranda* rights, and the subsequent interrogation, during which Trooper Torres served as the interpreter. Trooper Torres testified that he was not a certified interpreter, but his parents were born in Puerto Rico. Although he was born in the United States, Trooper Torres lived in Puerto Rico until the age of nine or ten, where he spoke predominantly Spanish in the home. He testified that he regularly serves as an unofficial interpreter when Spanish-speakers are arrested. Trooper Torres explained that there are times when he recognizes that an individual for whom he is interpreting does not comprehend what is being translated:

> Generally when I do interpret and I discover that the person I'm translating to doesn't understand what I'm speaking or what I'm trying to—the point I'm trying to get across, I will backtrack and first what I'll do is I'll translate for them. If they don't understand, they need to tell me, "I don't know what you mean." Then I'll break it down in layman's terms, so to speak. I'll rephrase it or change the wording, and generally that will—and then I'll ask them, "Do you understand now," and they'll give me the proper response yes or no. And if the answer is no, then I'll just

---

offered bathroom breaks, food, and drink during the interrogation. Detective Nelson further testified that Petitioner was never threatened to make the statement. Petitioner does not take issue with any of that testimony, or contend that, in these regards, the interrogation was conducted other than as described by Detective Nelson.

change the way I ask the question. And most—well, they always ask—I always ask, "Do you understand now?" They'll reply, "Yes, I understand."

Turning to Petitioner's case in particular, Trooper Torres testified that he first encountered Petitioner when he arrested Petitioner at his home. At that time, Torres communicated in Spanish with others at the house and then with Petitioner, while placing him under arrest. Trooper Torres testified that, at the State Police Barrack, he and Detective Nelson went into the interview room together to meet with Petitioner. Trooper Torres described that at the outset he identified himself and Detective Nelson as police officers, and he advised Petitioner that he was a subject of a murder investigation and that is why he was placed under arrest. Trooper Torres delivered all of this in Spanish and Petitioner responded in Spanish that he understood. Trooper Torres testified that "there was no confusion in [Petitioner's] face. There was no doubt in my mind that he understood what I was telling him."

Trooper Torres testified that he next administered the *Miranda* warnings to Petitioner in Spanish. Trooper Torres explained that he read from a Spanish language copy of a *Miranda* rights card and then translated into Spanish each right listed on the MSP 180 form, which contained the *Miranda* warnings, line by line.[5] After each line, Trooper Torres

---

5. The Maryland State Police (MSP) 180 form, entitled "Advice of *Miranda* Rights," was admitted into evidence at the suppression hearing. The *Miranda* warnings are written on the form as follows:
 1. You have the right to remain silent.
 2. Anything you say or write may be used against you in a court of law.
 3. You have the right to talk to a lawyer before answering any questions and to have a lawyer present at any time before or during questioning.
 4. If you now want the assistance of a lawyer but cannot afford to hire one, you will not be asked any more questions at this time and you may request the court to appoint a lawyer for you without charge.
 5. If you agree to answer questions, you may stop at any time and request the assistance of a lawyer, and no further questions will be asked of you.

asked Petitioner, "Do you understand[?]." If Petitioner indicated that he did not understand, Trooper Torres would rephrase each *Miranda* right and warning until he was satisfied that Petitioner understood.

Trooper Torres stated that, during his issuance of the *Miranda* warnings, Petitioner indicated that he did not understand the Spanish words for "court" and "attorney." In order to explain those words to Petitioner, Trooper Torres read from a card the phonetic spelling of what he believed to be the Mixtec versions of those two words. Trooper Torres explained that he obtained the phonetic spelling of "court" and "attorney" in Mixtec from the sister of Petitioner's confederate, Rutilio Melo. Torres testified that, while administering the *Miranda* warnings to Melo earlier that day,

> I made contact with [Melo's] sister who was also there at the barrack, and I would ask her what was the Mixtecan word for attorney, judge and court because those are words that [Melo] did not understand at that point. And she actually wrote them down phonetically for me, and then I went back into the interview with Melo and said it in [the] Mixtecan word for it, and at that point he did understand the *Miranda*.

Trooper Torres could not recall what Mixtec words he used in advising Petitioner. Yet he testified that,

> [w]hen [Petitioner] had a question on a certain portion of it, I would stop.... And that's when I utilized that paper I used with the other subject, translated into Mixtecan, and I

There follows on the form an "Acknowledgment," which states: "I have read or have had read to me this explanation of my rights." Below the Acknowledgment is a signature line on which Petitioner affixed his signature. Following the signature line is a "Waiver of *Miranda* Rights," which states:

> I fully understand each of these rights and I am willing to answer questions without consulting a lawyer or having a lawyer present at this time. My decision to answer questions is entirely free and voluntary and I have not been promised anything nor have I been threatened or intimidated in any manner.

Below the statement of waiver is a signature line, on which Petitioner affixed his signature.

just said it phonetically. And I even asked him, am I saying it right, and if he understood, and he would say yes, so then I would proceed.

Similarly, Trooper Torres stated that, when Petitioner indicated he did not understand,

I would stop, explain it again just in layman's terms. And if he still didn't understand, I would say, "Okay, what part am I saying do you not understand?" And then he would say whatever word he didn't understand. Again, attorney, abogado. And then I would say—I refer to my little note that the sister had provided me, and I would say, "Abogado means this." And he would say, "Okay."

Trooper Torres added that he could tell from the expression on Petitioner's face that he understood what was meant by the Mixtec version of "attorney."

Trooper Torres testified that, after interpreting the five lines of warnings from the MSP 180 form, and concluding that Petitioner understood the warnings, he proceeded to interpret for Petitioner the portion of the form that set forth "an acknowledgment saying that he has read or have had read the explanation of his rights to him. And I asked him if that's correct, sign that line. And I had my finger on the signature line. And he did sign it, and he put the date."

Trooper Torres then detailed how he reviewed with Petitioner the "waiver" portion of the MSP 180 form. He read the Spanish version on the *Miranda* rights card and then went over the form and translated it for Petitioner. Torres testified: "I translated it for him what the waiver of his rights was and asked him if he had any questions to ask me, and if that was correct, if he was waiving his rights, to sign that line and I pointed to the signature line, and he did." Trooper Torres confirmed that "each one of these lines" on the form was "translated word for word." Trooper Torres repeated that at no time did he fail to address Petitioner's lack of understanding. Petitioner signed the waiver of rights on the MSP 180 form.

Once the *Miranda* warnings were issued and Petitioner executed the written waiver, Trooper Torres interpreted for Petitioner and Detective Nelson as the latter began the unrecorded pre-interview, which was conducted entirely in Spanish and English. Petitioner's responses in Spanish were "immediate." Torres, directing his remark to the prosecutor, elaborated: "Just as we're having a conversation, a dialogue between you and I, [Petitioner's] responses were accurate with the question that I would ask, he would immediately reply with a correct answer. It wasn't like a wrong answer [was] given." Torres provided an example:

[T]he question [from Detective Nelson] was, "Do you remember the time—what time it was?" And I interpreted it in Spanish, and I asked him in Spanish, "Do you remember what time it was?" And his reply was, "No, I did not have a watch with me." And that was all in Spanish. It was immediate, no hesitation. There was no facial gestures of confusion, no stuttering or pondering, searching for words. His replies were immediate and correct.

At no time during the pre-interview did Petitioner ask for a further explanation of the questions asked. Trooper Torres similarly testified that during the subsequent, recorded interrogation Petitioner responded in Spanish to the questions and he "[n]ever stuttered" and he "didn't indicate to me that he did not understand what I was saying."

The State introduced without objection a transcript and audiotape of the recorded interrogation. The judge listened to the tape for the express purpose of determining for himself whether, as the trooper had described, Petitioner answered without hesitation the questions that were put to him.[6]

On cross-examination of the State's witnesses, defense counsel established that a normal reading in English of the *Miranda* warnings takes approximately 32 seconds but that,

---

**6.** The State also called Petitioner's confederate, Rutilio Melo, to establish further that Petitioner had at least a basic knowledge of Spanish. The suppression judge did not express reliance on Melo's testimony when ruling on the motion to suppress.

according to Detective Nelson's report, it took 22 minutes to advise Petitioner of those same rights. Trooper Torres testified that he translated each of the warnings, as set forth on the MSP 180 form, "word for word" and asked Petitioner if he understood. The trooper acknowledged, though, that he could not recall exactly what he said in explaining to Petitioner what was meant by each of the *Miranda* warnings.

Petitioner did not testify at the suppression hearing. Defense counsel asked the court to take judicial notice of a transcript of a hearing that had occurred two months earlier, on May 7, 2009. That earlier hearing, presided over by the same judge as presided at the suppression hearing, had been held to determine whether defense counsel was able to communicate effectively with his client, Petitioner, and whether Petitioner would be able to comprehend the proceedings. Two interpreters were present at the May 2009 hearing: Jose Lopez, who interpreted from English into Spanish; and Jose Gonzalez, who interpreted from Spanish into Mixtec Bajo. Petitioner's defense attorney had proffered at that hearing that he was having "an extraordinary amount of difficulty in communicating" with Petitioner. According to defense counsel, the two interpreters also "seemed to be having a great deal of difficulty in establishing true communication with" Petitioner, in part because the Mixtec interpreter spoke the Mixtec Bajo dialect, while Petitioner spoke Mixtec Alto. The court determined at the May 2009 hearing that, in order "to be effective, we need to try again to find a Mixteco Alto interpreter." The suppression hearing judge stated that he would consider what had occurred at that May hearing.

At the conclusion of the suppression hearing, the court heard argument of counsel and then ruled, denying the motion to suppress. The court framed the relevant question as whether, in light of the totality of the circumstances, Petitioner "could sufficiently understand Spanish in order to waive his rights under *Miranda* and could freely and voluntarily respond to the questions posed to him by Somerset County Detective Sergeant Nelson and interpreted into Spanish by Maryland State Trooper Torres." The court stated that it

"believe[d] the testimony of Trooper Torres to be both truthful and persuasive." Relying heavily on the testimony of Trooper Torres, the court ruled, by a preponderance of the evidence, that "the defendant voluntarily, knowingly and intelligently waived his *Miranda* Rights." The court found Trooper Torres's testimony to be supported by the observations of Detective Sergeant Nelson and corroborated by the audiotaped interview. The court also found that Petitioner's responses to the questions posed by the officers during the interrogation were "in uninterpreted Spanish, were immediate and without hesitation in such a manner to suggest that [Petitioner] fully understood the questions by the officers."

### The trial and appeal

Petitioner was tried before a jury in the Circuit Court for Somerset County. The jury found Petitioner guilty of first degree murder, first degree assault, and second degree assault. After merging the two assaults with the murder conviction, the court sentenced Petitioner to life in prison.

On appeal to the Court of Special Appeals, Petitioner argued, among other claims of error, that the statement he gave to the police was obtained in violation of *Miranda*. Petitioner argued that the State failed in its burden to prove the constitutional adequacy of the *Miranda* warnings and his waiver of the *Miranda* rights was neither informed nor voluntary. The intermediate appellate court held in an unreported opinion that the State had carried its burden of proving the constitutionality of both the warnings and waiver.

Petitioner filed a petition for writ of certiorari to answer the following questions:

1. Can the State ever meet its burden of persuasion in establishing that the language used by an advising officer reasonably conveyed the content of the *Miranda* warnings and that the defendant knowingly, intelligently, and voluntarily waived his rights when the officer issues the warnings in a foreign language and the State fails to place the content of those warnings into the record at trial?

2. Did the State fail to meet its burden in establishing that the *Miranda* warnings issued to the Petitioner reasonably conveyed his *Miranda* rights and that his waiver of those warnings was knowing, intelligent, and voluntary where the advising officer issued the warnings in a combination of Spanish and Mixtec, a Pre-columbian indigenous language with no relation to Spanish that was foreign to the officer; where the State failed to introduce the Mixtec language warnings used; where the officer testified that Petitioner had difficulty understanding the warnings, including the terms "court" and "attorney"; and where Petitioner was an 18 year old Mixtec Indian who had recently immigrated to the United States with no prior knowledge of the court system and no education?

3. Did the Court of Special Appeals improperly shift the burden of persuasion in the determination of the constitutionality of the *Miranda* waiver to the Petitioner when it required that the Petitioner present sufficient evidence that he did not understand Spanish when he was informed of his *Miranda* rights?

We granted the petition. *Gonzalez v. State*, 425 Md. 396, 41 A.3d 570 (2012). Because all three questions implicate the denial of the motion to suppress Petitioner's statement to the police, we shall address them together.

## II.

When reviewing the denial of a motion to suppress evidence, "we confine ourselves to what occurred at the suppression hearing. We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State." *Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238 (2011) (citations and internal quotation marks omitted). "We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *Id.* (quoting *State v. Luckett*, 413 Md. 360, 375, n. 3, 993 A.2d 25 (2010)). The credibility of the witnesses, the weight to be given to the evidence, and the reasonable inferences that may be drawn from the evidence

come within the province of the suppression court. *Longshore v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007) ("Making factual determinations, *i.e.* resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder. In performing this role, the fact finder has the discretion to decide which evidence to credit and which to reject." (internal citations omitted)). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Lee,* 418 Md. at 148–49, 12 A.3d 1238 (quoting *Luckett,* 413 Md. at 375, n. 3, 993 A.2d 25).

Petitioner contests the constitutional adequacy of both the warnings and the waiver. He relies on the undisputed facts that: (1) his native language is Mixtec (sub-dialect Alto), which is not merely a form of the Spanish language, but a different language altogether; (2) at the time of the interrogation, October 2005, Petitioner neither spoke nor comprehended English; and (3) Trooper Torres, who does not know Mixtec, could not recall, and the record does not otherwise demonstrate explicitly, what he said to convey to Petitioner the meaning of the words "court" and "attorney," as those terms are employed in the *Miranda* warnings. As for his claim that he could not possibly have made a knowing and intelligent waiver of the *Miranda* rights, Petitioner relies on these same undisputed facts and the added facts that, at the time of the interrogation, he was barely 18 years old, uneducated, and a recent immigrant to the United States with no prior contact with our criminal justice system.

Petitioner acknowledges the general rule that the State need not prove exactly what was said in issuing the *Miranda* warnings. He asserts nonetheless that, when it is shown that a suspect is being given *Miranda* warnings in a language that the advising officer does not himself speak fluently, the State must produce a precise record of "the critical words used to obtain that waiver," whether it be a recording, a transcript, notes, or exact recollection of the specific foreign-language words used. Petitioner emphasizes that Trooper Torres could not recall what Mixtec words were used to explain "court" and

"attorney." This lack of specificity in the record, Petitioner argues, prevented the suppression court and any reviewing court from determining the constitutional adequacy of the warnings. Petitioner further argues that Trooper Torres's use of the Spanish language, both in conveying the balance of the warnings (all but the words "court" and "attorney") and in obtaining Petitioner's waiver, likewise was inadequate to convey to Petitioner either the substance of the *Miranda* rights or what he was waiving when he signed the MSP 180 form.

The State counters that, even without a record of the Mixtec words used by Trooper Torres to convey the words "court" and "attorney" to Petitioner, the State met its burden to prove by a preponderance of the evidence that the warnings satisfy the requirements of *Miranda* and its progeny. The State directs us to the testimony of Trooper Torres, who the suppression court expressly found to be truthful. Trooper Torres explained in detail how he advised Petitioner of the *Miranda* rights in Spanish, how Trooper Torres obtained the Mixtec translation of certain words from Melo's sister, and how Petitioner indicated eventually that he understood each warning contained on the MSP 180 form. The State points out that Trooper Torres's testimony is corroborated by the audiotaped interview, where the Petitioner appeared to answer questions in Spanish appropriately and without hesitation.

We resolve the parties' dispute by resort, first, to the applicable law. The Fifth Amendment to the United States Constitution protects individuals from being compelled to make self-incriminating statements: "No person shall . . . be compelled in any criminal case to be a witness against himself." [7] U.S. Const. amend. V. In the seminal case of *Miranda v. Arizona,* the Court recognized that a "police-dominated atmosphere" can be inherently coercive and potentially "undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." 384 U.S. at 445,

7. The Fifth Amendment privilege against compelled self-incrimination applies to the States through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

467, 86 S.Ct. 1602. The Court held in *Miranda* that, "[i]n order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467, 86 S.Ct. 1602.

The prophylactic measures developed in *Miranda* are the now-familiar warnings that law enforcement personnel are required to convey to a suspect before embarking on any custodial interrogation:

> [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S.Ct. 1602.

██ The rights accorded by *Miranda* can be waived. *See id.* at 475, 86 S.Ct. 1602. The State has a "heavy burden" to establish that a suspect has waived those rights, *id.,* which means that the State must shoulder "the burden to establish waiver by a preponderance of the evidence," *Berghuis v. Thompkins,* ─ U.S. ──, ──, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010). In order to meet that burden, the State "must show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,*'" 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *Maryland v. Shatzer,* 559 U.S. 98, ──, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010) (alteration in original) (quoting *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602).

██ No particular wording or "precise formulation" need be used to impart the nature of the Fifth Amendment rights to the suspect. *Duckworth v. Eagan,* 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *see Florida v. Powell,* 559 U.S. 50, ──, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (2010) ("The four warnings *Miranda* requires are invariable, but this

Court has not dictated the words in which the essential information must be conveyed."). Rather, the proper "inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*' " *Duckworth,* 492 U.S. at 203, 109 S.Ct. 2875 (alteration in original) (quoting *California v. Prysock,* 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam)).

■ In determining the adequacy of the *Miranda* warnings, we look to the totality of the advisements. *State v. Luckett,* 413 Md. 360, 379–80, 993 A.2d 25 (2010).

[I]f the warnings, viewed in the totality, in any way misstate the suspect's rights to silence and counsel, or mislead or confuse the suspect with respect to those rights, then the warnings are constitutionally infirm, rendering any purported waiver of those rights constitutionally defective and requiring suppression of any subsequent statement.

*Id.* at 380, 993 A.2d 25.

■ Even if the warnings themselves pass constitutional muster, the State still must prove, upon proper challenge, that the suspect's waiver of the rights conveyed in those warnings was knowing and voluntary. The adequacy of a suspect's waiver of the *Miranda* rights "is not one of form, but rather whether the defendant *in fact* knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (emphasis added). Therefore, although "the courts must presume that a defendant did not waive his rights" and "the prosecution's burden is great" to prove waiver, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.; see also Berghuis,* 130 S.Ct. at 2261.

■ In evaluating the validity of a waiver in a given case, the court must consider "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. 1019; *see Butler,* 441 U.S. at 374–75, 99 S.Ct. 1755. This inquiry has "two distinct dimensions":

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). This approach requires an examination of "all the circumstances surrounding the interrogation," including the individual's "age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare,* 442 U.S. at 725, 99 S.Ct. 2560; *accord McIntyre v. State,* 309 Md. 607, 615–16, 526 A.2d 30 (1987).

Upon our independent review of the record developed at the suppression hearing, we conclude, for the reasons that follow, that the circuit court properly denied Petitioner's motion to suppress his statement to the police. As we shall see, the facts found by the suppression court largely dictate our conclusion.

### The Miranda warnings

■ In evaluating the adequacy of the warnings issued by Trooper Torres, we begin with a crucial credibility determination made by the suppression court. The court stated that it "believe[d] the testimony of Trooper Torres to be both truthful and persuasive." That credibility determination is virtually unassailable. Consequently, we, as the reviewing court, must accept as fact (as obviously did the suppression court) Trooper Torres's testimony concerning his impressions of Petitioner's comprehension of not only the Spanish language,

but also the trooper's phonetic pronunciation of the Mixtec words for "court" and "attorney." Indeed, the suppression court found that Petitioner "could sufficiently understand Spanish in order to waive his rights under *Miranda*." Implicit in that finding, moreover, is the suppression court's predicate (albeit unexpressed) finding that Petitioner sufficiently comprehended the *Miranda* warnings so as to enable him to make a valid waiver of the rights described therein.[8]

We therefore view the testimony of Trooper Torres as presenting an accurate recitation of what occurred as he delivered the *Miranda* warnings to Petitioner. Based on Trooper Torres's recitation of what occurred, we, like the suppression court, are able to conclude the following: (1) with the exception of two words ("court" and "attorney") Trooper Torres painstakingly—and, ultimately, successfully—conveyed to Petitioner in Spanish the balance of the *Miranda* warnings accurately set forth on the MSP 180 form;[9] and (2) Trooper Torres's use of the phonetic spelling of what he understood to be the Mixtec words for "court" and "attorney" sufficiently conveyed to Petitioner, based on his reaction to the trooper's pronunciation, the meaning of court and attorney. To be sure, the State could have resolved all doubt in this regard had it been able to offer into evidence the note from which Trooper Torres read the phonetically spelled Mixtec words. Nonetheless, the evidence the State did present, which was fully credited by the suppression court, legally sufficed to support

---

8. We readily presume, *see Thornton v. State*, 397 Md. 704, 736, 919 A.2d 678 (2007), that the experienced circuit court judge who presided over the suppression hearing knows quite well that no suspect can make a valid waiver of rights that have not been sufficiently described in a way that is comprehensible to the suspect.

9. Petitioner argued to the suppression court, and reargues here, that the length of time Trooper Torres took in explaining the *Miranda* rights (22 minutes) is evidence of Petitioner's lack of comprehension. The suppression court saw no merit in the argument, given the totality of the evidence suggesting the contrary. Neither do we. If anything, the length of time Trooper Torres spent explaining the rights is indicative of his desire to ensure that Petitioner understood those rights.

that court's conclusion that the *Miranda* advisements were constitutionally adequate.

Our conclusion that witness testimony may be sufficient to establish the adequacy of *Miranda* warnings delivered in a foreign language, without an audiotape or a transcript of the advisement, finds support in the decisions of other state supreme and federal courts. For example, in *United States v. Abdi Wali Dire*, 680 F.3d 446, 470 (4th Cir.2012), *petition for cert. filed*, —— U.S.L.W. —— (U.S. Oct. 2, 2012) (No. 12–6529), multiple defendants were advised of their *Miranda* rights in Somali through an interpreter. The Court of Appeals for the Fourth Circuit rejected the defendants' argument that "the court could not determine the exact content of the warnings based on [the agent's] testimony." *Id.* at 473. The Court determined that the district court had "reasonably accepted the testimony of [the advising agent]," notwithstanding that "there were 'slight variations in the recollections' " of the law enforcement personnel present during the advisement. *See also Perri v. Director, Dep't of Corrections*, 817 F.2d 448, 453 (7th Cir.1987) (affirming denial of habeas corpus petition based on testimony in the record and state court's implicit finding that defendant understood his rights, where *Miranda* warnings were administered in an Italian dialect different from defendant's dialect); *People v. Duck Wong*, 18 Cal.3d 178, 133 Cal.Rptr. 511, 555 P.2d 297, 299, 302 (1976) (affirming trial court's determination, based on its evaluation of conflicting testimony regarding the content of the advisement and the accuracy of the translation, that proper *Miranda* warnings had been administered in Chinese using an acquaintance of the defendant as an interpreter); *Commonwealth v. Colon–Cruz*, 408 Mass. 533, 562 N.E.2d 797, 803 (1990) (affirming denial of motion to suppress a statement where *Miranda* warnings were administered in Spanish and suppression court considered officer's testimony, which included a recitation in Spanish of "approximately the same warnings he gave to the defendant on the night of the arrest," despite testimony of an interpreter that the officer spoke with a "heavy Anglo accent" and used two imprecise words in his translation of the *Mi-*

*randa* warnings into Spanish). *Cf. United States v. Yunis,* 859 F.2d 953, 960–61 (D.C.Cir.1988) (reversing trial court's suppression of statements and noting the "dubious relevance to the validity of [the defendant's] waiver" of *Miranda* rights that the interrogation sessions were not audio- or videotaped, even though the equipment was readily available, because "there is no constitutional requirement that confessions be recorded by any particular means").

*Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980), and *Hale v. State,* 5 Md.App. 326, 247 A.2d 409 (1968), upon which Petitioner relies, do not undermine our conclusion that the record supports the suppression court's ruling. We glean the following from *Tague,* a seven-paragraph per curiam opinion. In that case, an officer testified that

he read petitioner his *Miranda* rights from a card, that he could not presently remember what those rights were, that he could not recall whether he asked petitioner whether he understood the rights as read to him, and that he "couldn't say yes or no" whether he rendered any tests to determine whether petitioner was literate or otherwise capable of understanding his rights.

444 U.S. at 469, 100 S.Ct. 652. Citing *Miranda* and *Butler,* the *Tague* Court noted that the burden to establish the admissibility of the defendant's confession to the police rightly rests with the State. *Id.* at 470–71, 100 S.Ct. 652. The *Tague* Court held that the prosecution had not carried its burden because, "[i]n this case, no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement." *Id.* at 471, 100 S.Ct. 652.

Similarly, in *Hale,* the Court of Special Appeals held that a criminal defendant's statements were improperly admitted at trial. 5 Md.App. at 330, 247 A.2d 409. In that case, the advising officer testified that, before beginning questioning, he used a *Miranda* card located in the interrogation room to read and explain to the suspect his rights; the suspect read the

card himself; and the suspect indicated that he understood those rights. *Id.* at 328–29, 247 A.2d 409. The State did not offer the card into evidence, and, although the officer stated that the suspect "was advised of his rights to counsel; he didn't have to say anything and anything that he did say could be used against him in court," the officer was unable to remember what else, if anything, was written on the card. *Id.* at 329, 247 A.2d 409. The court found nothing in the record to establish that the suspect had been advised of his "right to consult with a lawyer and to have the lawyer with him during the interrogation," "[n]or was he told that if indigent a lawyer would be appointed to represent him, as required by *Miranda.*" *Id.* at 330, 247 A.2d 409. The *Hale* court (correctly, in our view) did not require that the content of the *Miranda* card be introduced into evidence. *Id.* Yet, "it is not sufficient for the police officer to simply state that he advised the accused of his *Miranda* rights or that he read the *Miranda* card to him. There must be a clear-cut showing in the record that the requisite warnings were in fact given." *Id.*

The present case is readily distinguishable from *Tague* and *Hale.* In *Tague,* unlike here, the advising officer did not testify as to what he said and did in the course of delivering the *Miranda* rights, much less did that officer detail, as Trooper Torres did, the efforts he made to guarantee, insofar as reasonably he could, that Petitioner comprehended the rights being explained to him. In *Hale,* unlike here, there was *no* evidence that the suspect was made aware of at least several of the key rights that *Miranda* requires be included in the advisement, including the right to consult with an attorney, to have the attorney present during questioning, and to have an attorney appointed by the court if he was indigent.

We re-emphasize that, had the police audiotaped or, better still, audio— *and* videotaped the issuance of the *Miranda* rights and Petitioner's waiver of them, there would be little cause to decide, as the suppression court and two appellate courts have had to do, whether the warnings issued to Petitioner satisfy the constitutional standard of an adequate expla-

nation of the rights dictated by *Miranda*.[10] That said, we conclude that the suppression court, upon hearing—and fully crediting—the testimony of Trooper Torres, properly ruled that the State had carried its burden to prove the constitutionality of the *Miranda* warnings.

### *The* Miranda *waiver*

We likewise conclude that the State proved the constitutionality of Petitioner's waiver of the *Miranda* rights. Petitioner makes no allegation that he was threatened or coerced into making statements, that deceptive practices were used against him, or that his statements were the result of promises or inducements or that his will was overborne. Rather, Petitioner argues that his lack of comprehension of the *Miranda* warnings, assessed together with his personal characteristics, made it impossible for him to have made a knowing waiver of his *Miranda* rights.

Much of what we have said in analyzing the warnings given to Petitioner holds true for his waiver of the rights described in those warnings. Indeed, Petitioner's argument for why his waiver was "unknowing" rests largely upon the contention that he could not make a good waiver of the rights without being adequately informed of those rights. We have explained, *supra*, why that argument fails.

Nor was Petitioner's waiver rendered unknowing by the facts that, at the time, Petitioner was 18 years old, uneducated, and a recent immigrant to the United States unacquainted with this country's criminal justice system. Without more, these facts do not render Petitioner unable, as a matter of law, to make a knowing (or, for that matter, involuntary) waiver of his *Miranda* rights. Indeed, in *McIn-*

---

10. In their unreported opinion in this case our colleagues on the Court of Special Appeals expressed the same sentiment this way:

[W]here officers are required to provide the *Miranda* warnings in a foreign language, we believe that the better practice is to either record the advisement of rights or, at a minimum, create a record of the words that the officer used so that a reviewing court can determine if the officer gave the warnings properly.

*tyre v. State,* 309 Md. 607, 526 A.2d 30 (1987), this Court affirmed a trial court's determination that a valid waiver had been obtained from an individual of a much younger age (15 years old), who, evidently, had no prior exposure to the criminal justice system. *Id.* at 625, 526 A.2d 30.

Petitioner also finds support for his position in the evidence offered at the suppression hearing that, at an earlier hearing held in May 2009, the same judge who presided at the suppression hearing had determined that a Mixtec Alto interpreter was required in order for Petitioner to be able to understand the trial proceedings and to permit effective communication between Petitioner and defense counsel. Petitioner's reliance on the May 2009 hearing is, in the end, unavailing. It does not follow from the judge's ruling at the May 2009 hearing that Petitioner was to have a Mixtec Alto interpreter at trial that Petitioner did not sufficiently comprehend the *Miranda* warnings and make a knowing waiver of the *Miranda* rights. Indeed, as the State points out, at the May 2009 hearing the judge did not have the benefit of listening to the audiotaped interrogation, which demonstrates Petitioner's ability to understand and answer questions posed in Spanish. *See, e.g., Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir. 1989) (affirming district court's denial of habeas petition based on harmless error, but rejecting defendant's contention that he did not effectively waive his *Miranda* rights because he did not understand the warnings where *Miranda* warnings were delivered in English although defendant's native tongue was Spanish and appellate court was evidently aware that defendant "testified on his own behalf through an interpreter" at trial); *United States v. Bernard S.,* 795 F.2d 749, 752 (9th Cir.1986) (affirming district court's finding that defendant validly waived his *Miranda* rights where *Miranda* warnings were delivered in English and appellate court noted that defendant clearly had some difficulty with English, his native language was Apache, and "he was assisted at trial by an interpreter").

 Trooper Torres's testimony, corroborated by Detective Nelson, and credited by the suppression court, was that Petitioner appeared to Trooper Torres to comprehend and voluntarily execute, with his signature, the waiver portion of the MSP 180 form. The court also had the benefit of listening to the audiotaped interrogation. The court said, as to that, "[A]lthough this Judge does not speak Spanish, in listening to the audiotape, the defendant's responses to the questions posed by the officers are in uninterpreted Spanish, were immediate and without hesitation in such a manner to suggest that defendant fully understood the questions by the officers." [11] The suppression court did not err in determining, based on the evidence the court chose to credit fully, that Petitioner made a knowing and voluntary waiver of the *Miranda* rights.

### Conclusion

 We hold that the suppression court reasonably could find, from the totality of the evidence offered by the State, not countered by testimony of Petitioner to the contrary,[12] that the

---

**11.** We too have listened to the audiotaped interrogation and agree with the suppression court's conclusion that, judging from both the tempo and substance of Petitioner's responses, he appeared to understand Trooper Torres's Spanish interpretation of Detective Nelson's questions.

**12.** The panel of the Court of Special Appeals in its unreported opinion referred (as we have done) to the fact that Petitioner did not testify at the suppression hearing. Petitioner contests in his third question presented that, by doing so, the panel shifted the burden to him to prove that the *Miranda* warnings and his waiver were unconstitutional. He directs us to the following excerpt from the panel opinion:

At the suppression hearing, Gonzalez failed to present any evidence to support his position that he did not understand Spanish when Trooper Torres informed him of his rights.... Although, at a suppression hearing, the burden to prove a voluntary, knowing, and intelligent waiver of rights rests with the State, *Johnson* [*v. Zerbst*], 304 U.S. [458,] 464, 58 S.Ct. 1019, 82 L.Ed. 1461 [(1938)], where the State satisfies that burden and the defendant appeals, the defendant must be able to present sufficient evidence to support its allegation of error.

The panel, however, expressly disavowed any suggestion that it was shifting the burden to Petitioner:

State proved both that proper *Miranda* warnings were adequately conveyed to Petitioner and that he knowingly and voluntarily waived those rights, before he was interrogated and made the statement he sought to suppress. The suppression court did not err in denying the motion to suppress the statement, and the Court of Special Appeals properly affirmed that ruling.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., HARRELL and GREENE, JJ., dissent.

BELL, C.J., dissenting, in which HARRELL and GREENE, JJ., join.

After trial before a jury in the Circuit Court for Somerset County, the petitioner, Ramiro Arce Gonzalez, was found

---

> Our conclusion should not be understood as placing the burden of proof in a suppression hearing on the defendant. As we stated above, the burden of proof quite clearly rests with the State.... However, where the State satisfies that burden below, we require more than a proffer by the defendant's attorney to conclude that the trial court erred in reaching a factual conclusion. The trial court is in a better position to make such factual determinations, and we do not believe that there is sufficient evidence in the record to conclude that it was wrong.

We do not read the excerpt of the unreported opinion of the Court of Special Appeals upon which Petitioner relies as demonstrating a flawed analysis by that court of his *Miranda* claims. Indeed, this Court has noted that once the State had presented legally sufficient evidence to prove by a preponderance of the evidence that a defendant made a knowing and voluntary waiver of the *Miranda* rights, *and* the suppression court credits that evidence and is persuaded by it, the defendant is hard-pressed on appeal to contend, as Petitioner has done here, that the suppression ruling was legally incorrect. *See Lee v. State*, 418 Md. 136, 160, 12 A.3d 1238 (2011) (noting that the petitioner, though moving to suppress his statement to police as involuntarily obtained, did not testify that his confession was the product of the interrogating detective's coercive comment; thus, "we do not have even [the petitioner's] word that [the detective's] improper comment overbore his will and produced his confession"). But even if we were to conclude that our colleagues had intimated a burden shifting (which, as the panel opinion reflects, they did not) that conclusion would avail Petitioner not at all, because we are obliged to make an independent assessment of the suppression court's ruling. We have done so, and, like the Court of Special Appeals, find no error.

guilty of first degree murder, first degree assault, and second degree assault. His convictions were based, primarily, on an inculpatory statement he made to law enforcement officials. Before trial, the petitioner sought to suppress the statement on the basis that he did not receive warnings in accordance with, and as required by, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and, as a result, he could not, and did not, make a knowing waiver of his Fifth Amendment privilege against self-incrimination. The Court of Special Appeals affirmed the petitioner's convictions in an unreported opinion. He petitioned this Court for issuance of a writ of certiorari. In his petition, he challenged his convictions on the ground that his statement was elicited, and subsequently admitted into evidence, in violation of *Miranda*.

The majority affirms the judgment of the Court of Special Appeals. *Gonzalez v. State*, 429 Md. 632, 638, 57 A.3d 484, 487 (2012). It concludes that the petitioner was informed properly of his Fifth Amendment rights under *Miranda*, and that his waiver of those rights was sufficient, both voluntarily and intelligently made. *Id.*, 429 Md. at 651–53, 57 A.3d at 495–96. Because I believe that the majority's conclusion flies in the face of *Miranda* and its progeny, I dissent.

## I.

When we review a trial court's grant or denial of a motion to suppress, we "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). Additionally, "[w]e review evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion." *Hill v. State*, 418 Md. 62, 77, 12 A.3d 1193, 1202 (2011) (citation omitted) (internal quotation marks omitted). It is important to note, however, that when the underlying question involves the possible abridgement of a constitutional right, "the reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones*

*v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996). Thus, while "an appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact," *Longshore,* 399 Md. at 498, 924 A.2d at 1135, when a case presents the court with a mixed question of law and fact, as is the case when reviewing a suppression court's determination of whether *Miranda* warnings were properly given and/or a waiver of *Miranda* rights was constitutionally obtained, that determination is subject to *de novo* review. *Hill,* 418 Md. at 77, 12 A.3d at 1202.

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964), provides, in relevant part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. CONST. amend. V. In giving effect to that guarantee, the Supreme Court of the United States, recognizing that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," required, as a prophylactic measure, that an individual accused of a crime "be adequately and effectively apprised of his rights" under the Fifth Amendment, and that "the exercise of those rights ... be fully honored," in order to "permit a full opportunity to exercise the privilege against self-incrimination." *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719.

Compliance with the *Miranda* Court's mandate, thus, requires, "[a]t the outset, if a person in custody is to be subjected to interrogation, [that] he ... first be informed in clear and unequivocal terms that he has a right to remain silent." *Id.,* 384 U.S. at 467–68, 86 S.Ct. at 1624, 16 L.Ed.2d at 720. This warning "must be accompanied by the explanation that anything can and will be used against the individual in court ... in order to make him aware not only of the privilege, but also of the consequences of foregoing it." *Id.,* 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 720–21.

Penultimately, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation. . . ." *Id.,* 384 U.S. at 471, 86 S.Ct. at 1626, 16 L.Ed.2d at 722. Finally, "it is necessary to warn [the defendant] . . . that if he is indigent a lawyer will be appointed [by the court] to represent him." *Id.,* 384 U.S. at 473, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.

To be sure, the Supreme Court has made clear that, in administering the *Miranda* warnings, "no talismanic incantation [is] required to satisfy its strictures." *California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696, 701 (1981). Indeed, it has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan,* 492 U.S. 195, 202, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166, 176 (1989). Instead, in determining whether the warnings are "adequate[ ] and effective[ ]" based on the standard articulated in *Miranda, supra,* "the inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda.*" *Id.,* 492 U.S. at 203, 109 S.Ct. at 2880, 106 L.Ed.2d at 177 (quoting *Prysock,* 453 U.S. at 361, 101 S.Ct. at 2810, 69 L.Ed.2d at 702) (internal quotation marks omitted). We have held that this determination is made by looking to "the totality of the advisements, both oral and written." *Rush v. State,* 403 Md. 68, 90, 939 A.2d 689, 702 (2008).

While a defendant may waive his Fifth Amendment privilege against self-incrimination, thus foregoing the protections set forth in *Miranda,* the validity of such a waiver is governed by the high standard, consistently reinforced by the Supreme Court, that applies to the waiver of constitutional rights. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *Maryland v. Shatzer,* 559 U.S. 98, ——, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045, 1052–53 (2010). Specifically, once the warnings are administered, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his

right to retained or appointed counsel." *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. In order to successfully meet its burden, the State is required to prove the existence of two distinct elements:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986) (quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979)).

## II.

The petitioner is an immigrant to the United States from Mexico, whose native language is Mixtec, and who does not speak or comprehend the English language. While in custody, charged with the murder of Cheryl Williams, the petitioner made the inculpatory statement whose admission is at issue in this case. In the statement, he admitted to having sexual intercourse with the victim, being present when she was bludgeoned to death, and helping Rutilio Melo, another suspect in the murder, hide her body. The petitioner's statement also suggested that the murder was premeditated.

The petitioner subsequently moved to suppress his inculpatory statement. At the suppression hearing, Trooper Ed Torres, who gave the petitioner the *Miranda* warnings, testified as to how that process proceeded.[1] Trooper Torres, who is fluent in Spanish but has no knowledge of Mixtec, gave the *Miranda* warnings in Spanish, using Maryland State Police

---

1. Detective Nelson, the lead investigator in the case, also testified.

("MSP") form 180.[2] He testified that it took twenty-two minutes to complete the warnings and get the petitioner's waiver, twenty-one minutes longer than usual. Describing the procedure he followed, Trooper Torres stated that he initially read the form in English, then translated it, word-for-word, to Spanish. In addition, he read the rights as set forth on a Spanish version of a *Miranda* card. When the petitioner would indicate that he did not understand what he was being told, Trooper Torres testified that he would simply rephrase those parts of the warning, in an effort to explain further, until the petitioner indicated that he understood. Trooper Torres testified that the petitioner indicated specifically that he did not understand the Spanish words for "court" and "attorney." Not being fluent in Mixtec, Trooper Torres obtained what was purported to be the Mixtec words for "court" and "attorney" from the sister of the other suspect in the case, and then re-

---

**2.** Maryland State Police Form 180 delineates 5 rights, consistent with *Miranda* rights, to be read to detainees:

"1. You have the right to remain silent.
"2. Anything you say or write may be used against you in a court of law.
"3. You have the right to talk to a lawyer before answering any questions and to have a lawyer present at any time before or during questioning.
"4. If you now want the assistance of a lawyer but cannot afford to hire one, you will not be asked any more questions at this time and you may request the court to appoint a lawyer for you without charge.
"5. If you agree to answer questions, you may stop at any time and request the assistance of a lawyer, and no further questions will be asked of you."

The form includes the acknowledgment, "I have read or have had read to me this explanation of my rights." Finally, the form includes a "Waiver of *Miranda* Rights," which reads:

"I fully understand each of these rights and I am willing to answer questions without consulting a lawyer or having a lawyer present at this time. My decision to answer questions is entirely free and voluntary and I have not been promised anything nor have I been threatened or intimidated in any manner."

In this case, the petitioner signed both the acknowledgment and the Waiver. This was done, according to Trooper Torres, after he, using the same procedure, interpreted the "Acknowledgment" and the "Waiver" portion of the MSP 180 form, word for word, subsequently obtaining the petitioner's signature.

read that portion of the rights form using those words. Trooper Torres did not testify as to what the Mixtec words were that he used, conceding that he could not remember them. Nor were the words reflected in any way in the trial record. Indeed, unlike the taking of the statement, the warning process was not recorded.

After obtaining the petitioner's written acknowledgment and waiver, Detective Nelson proceeded to conduct a pre-interview of the petitioner in English, with Trooper Torres translating to Spanish. According to the officers, the petitioner answered the questions without hesitation, and did not, at any time, ask for further explanation of the questions asked. A transcript and audiotape of the officers' subsequent interrogation was introduced into evidence, to enable the suppression judge to corroborate the description provided by Detective Nelson and Trooper Torres of the interrogation.

On the basis of this testimony, and in light of the evidence before it, the suppression court denied the motion to suppress, finding that the petitioner knowingly, intelligently and voluntarily waived his *Miranda* rights. It reasoned:

"We know that the question is not one of form with respect to *Miranda*, but rather, whether the defendant, in fact, knowingly and voluntarily waived the rights delineated in the *Miranda* case.

"Under the totality of the circumstances, the Court must determine whether defendant acted voluntarily, knowingly, and intelligently in waiving his rights under *Miranda*. The Court must, as indicated, assess the credibility of the witnesses.

"In this case, the Court believes the testimony of Trooper Torres to be both truthful and persuasive. He was a person in the best position as he is fluent in Spanish and English to review the *Miranda* form with the defendant to assess the defendant's level of understanding of the *Miranda* form.

"The Court finds by a preponderance of the evidence, under the totality of the circumstances, after considering the testimony and the exhibits, that the defendant voluntarily, know-

ingly, and intelligently waived his *Miranda* Rights, and his statement made thereafter was made without force or coercion, or was made—and was not made after any hope or promise made to the defendant. For those reasons, the defendant's motion to suppress is denied."

A trial was then held, following which a jury convicted the petitioner of first degree murder, first degree assault, and second degree assault.

The petitioner's arguments, made on appeal to the Court of Special Appeals, that the State failed to prove either that he was properly advised of his *Miranda* rights or that he knowingly, intelligently, and voluntarily waived those rights, were rejected by that court. The intermediate appellate court, heavily relying on the testimony of Detective Nelson and Trooper Torres, professed to be satisfied that "the State . . . met its heavy burden to show that Gonzalez understood his rights and freely waived them," although it also concluded that "[a]t the suppression hearing, Gonzalez failed to present any evidence to support his position that he did not understand Spanish when Trooper Torres informed him of his rights." [3]

The petitioner subsequently petitioned this Court for a writ of certiorari, which we granted, *Gonzalez v. State*, 425 Md. 396, 41 A.3d 570 (2012), to consider the following questions:

---

**3.** Apparently aware of the potential for interpreting the latter conclusion as shifting the burden of proof, the Court of Special Appeals was quick to disavow any such intention:

"Our conclusion should not be understood as placing the burden of proof in a suppression hearing on the defendant. As we stated above, the burden of proof quite clearly rests with the State to demonstrate a voluntary, knowing, and intelligent waiver of rights. However, where the State satisfies that burden below, we require more than a proffer by the defendant's attorney to conclude that the trial court erred in reaching a factual conclusion. The trial court is in a better position to make such factual determinations, and we do not believe that there is sufficient evidence in the record to conclude that it was wrong."

I do not believe that this disclaimer actually lays a claim of burden shifting to rest. Indeed, I believe it makes it even more problematic and real.

"1. Can the State ever meet its burden of persuasion in establishing that the language used by an advising officer reasonably conveyed the content of the *Miranda* warnings and that the defendant knowingly, intelligently and voluntarily waived his rights when the officer issues the warnings in a foreign language and the State fails to place the content of those warnings into the record at trial?

"2. Did the State fail to meet its burden in establishing that the *Miranda* warnings issued to the Petitioner reasonably conveyed his *Miranda* rights and that his waiver of those warnings was knowing, intelligent, and voluntary where the advising officer issued the warnings in a combination of Spanish and Mixtec, a Pre-columbian indigenous language with no relation to Spanish that was foreign to the officer; where the State failed to introduce the Mixtec language warnings used; where the officer testified that Petitioner had difficulty understanding the warnings, including the terms "court" and "attorney"; and where Petitioner was an 18 year old Mixtec Indian who has recently immigrated to the United States with no prior knowledge of the court system and no education?

"3. Did the Court of Special Appeals improperly shift the burden of persuasion in the determination of the constitutionality of the *Miranda* waiver to the Petitioner when it required that the Petitioner present sufficient evidence that he did not understand Spanish when he was informed of his *Miranda* rights?"

The majority affirms the judgment of the Court of Special Appeals, and thus of the suppression court, largely on the basis of the suppression court's credibility determination regarding the testimony of Trooper Torres. *Gonzalez*, 429 Md. at 651–53, 57 A.3d at 495–96. It concludes from that determination that the petitioner not only "sufficiently comprehended the *Miranda* warnings," but that this comprehension enabled the petitioner "to make a valid waiver of the right described therein." *Id.*, 429 Md. at 652–53, 57 A.3d at 496. To be sure, the majority acknowledges that " 'it is not sufficient for [a] police officer to simply state that he advised the accused of his

*Miranda* rights,' " and that the State must set forth " 'a clear-cut showing in the record that the requisite warnings were in fact given.' " *Id.*, 429 Md. at 656, 57 A.3d at 498 (quoting *Hale v. State*, 5 Md.App. 326, 330, 247 A.2d 409, 411 (1968)). Nonetheless, agreeing with the State, that Trooper Torres' testimony, along with the MSP 180 form signed by the petitioner, was sufficient to—and did, in fact—prove that *Miranda* advisements were reasonably conveyed to the petitioner, it is convinced that "the suppression court, upon hearing—and fully crediting—the testimony of Trooper Torres, properly ruled that the State had carried its burden to prove the constitutionality of the *Miranda* warnings." *Id.*, 429 Md. at 657, 57 A.3d at 498. As to Trooper Torres' testimony, the majority views it as indicating that, "(1) with the exception of two words ('court' and 'attorney') Trooper Torres painstakingly—and, ultimately, successfully—conveyed to Petitioner in Spanish the balance of the *Miranda* warnings accurately set forth on the MSP 180 form; and (2) Trooper Torres's use of the phonetic spelling of what he understood to be the Mixtec words for 'court' and 'attorney' sufficiently conveyed to Petitioner, based on his reaction to the trooper's pronunciation, the meaning of court and attorney." *Id.*, 429 Md. at 653, 57 A.3d at 496 (footnote omitted). It consequently holds that "the suppression court reasonably could find, from the totality of the evidence offered by the State . . . that the State proved both that proper *Miranda* warnings were adequately conveyed to Petitioner and that he knowingly and voluntarily waived those rights, before he was interrogated and made the statement he sought to suppress." *Id.*, 429 Md. at 659–60, 57 A.3d at 500. I disagree.

I believe, as does the petitioner, that the *Miranda* warnings given to the petitioner in this case could not, and did not, pass constitutional muster.[4] What is at issue is the sufficiency of

---

4. The petitioner maintains, and therefore argues, that, given the language barrier, involving both the Trooper and himself, in the absence of a recording, transcript, notes, or the officer's own recollection regard-

the *Miranda* warnings given by Trooper Torres, not just the Trooper's credibility. Those warnings, except for two words, were given in Spanish, the language in which the Trooper was fluent, and not in Mixtec, the defendant's native language, with which the Trooper was unfamiliar. Significantly, the record does not contain the two actual, purported Mixtec words (the source of which was the sister of Melo, the other suspect, a person not known by Torres, and whose knowledge of Mixtec was not established) that were used and it reveals that the interpreter did not know Mixtec and does not recall what Mixtec words he used in informing the petitioner of his rights. Under these circumstances, where, other than the acceptance of the warning officer's testimony, there is absolutely no evidence to corroborate the warning officer's conclusion that the defendant understood the rights of which he was apprised, a court would have to presume, based solely on that testimony, that the defendant understood those rights. It follows, then, that the petitioner's subsequent waiver of his Fifth Amendment privilege against self-incrimination, whether or not voluntary, was certainly not knowing and intelligent. The petitioner's motion to suppress his custodial statement should have been granted.

There is a "heavy burden" of proving that a waiver of *Miranda* rights was adequate—intelligently, knowingly and voluntarily done. That heavy burden rests squarely on the State. 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. This is so because "the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation...." *Id.* Accordingly, an important component of the State's burden to prove adequate waiver is the responsibility to demonstrate the sufficiency of the warnings that were

---

ing certain parts of the warnings, the suppression court could not reasonably have formed a complete picture of the circumstances surrounding the interrogation, and thus, could not make an accurate determination concerning the petitioner's comprehension of the warnings. I agree; however, we need not go so far in this case.

administered to the suspect, to show that they were such as would permit a suspect to waive his or her rights. That means, as we have seen, that those warnings must have been such as would have "adequately and effectively apprised" the suspect of the privileges afforded to him by the Fifth Amendment to the United States Constitution. *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. Anything less would enable, indeed facilitate, a court's "creat[ion of] a presumption that [a] defendant understood his constitutional rights and plac[ing] the burden of proof upon the defendant, instead of the state, to demonstrate whether the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," *Tague v. Louisiana,* 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622, 624–25 (1980) (quoting *State v. Tague,* 372 So.2d 555, 558 (La.1979)), against which the Supreme Court of the United States has cautioned.

The suppression court could not, and should not have found, based primarily on the testimony of Trooper Torres, that the petitioner's waiver was knowing and intelligent. In so doing, the suppression court, in the absence of evidence to support that conclusion, simply presumed, on the basis of the Trooper's deficient testimony, which it found credible, that the warnings he gave were adequate, that the petitioner understood them and that he knowingly waived them. As already pointed out, the issue in this case is not one resolvable by reference, or deference, to the court's first level fact-finding. Rather, the issues are the adequacy of the warnings given and whether the petitioner properly waived his *Miranda* rights, mixed questions of law and fact. In the absence of a recording reflecting what the petitioner was told with regard to his rights, the suppression court could not have, and should not have, concluded that the warnings were constitutionally adequate or that the petitioner's waiver of the rights was intelligently and knowingly done.

This record is clearly and undisputedly deficient. First, there is no record of the actual warnings given. To be sure, Trooper Torres, who had no knowledge of the petitioner's

native tongue, testified that he used the Mixtec words for "attorney" and "court" in place of the Spanish translation when the petitioner indicated that he did not understand them. But underscoring the inadequacy of the record, as well as the problematic nature of the warning process, is the fact that Trooper Torres could not testify as to the Mixtec words that he did use to convey this portion of the warnings, because he did not remember them; thus, the record does not reflect what words he did use. "Court" and "attorney" are important, if not essential, to the *Miranda* warnings, and are at the core of not simply the voluntariness inquiry, but also in the waiver analysis. Whether the petitioner understood those concepts is critical to both the adequacy issue and the waiver issue. Without knowing precisely what the petitioner was told with respect to those concepts, it is no more possible for the court to have concluded that the Trooper adequately advised the petitioner than it would be if the officer testified to having given *Miranda* warnings without delineating what they were. Trooper Torres was not a certified translator of even Spanish. He testified that the warnings, which ordinarily took less than a minute, took over twenty in this case, because the petitioner had trouble understanding them as delivered. It was simply improper for the suppression court to conclude, on the basis of evidence demonstrating not only that the petitioner was administered warnings in a language entirely distinct from his own, but also that the officer who administered these warnings did so in an unreliable and uncorroborated combination of Spanish and Mixtec, that those warnings "reasonably conveyed" the essence of the petitioner's rights under *Miranda. Duckworth,* 492 U.S. at 203, 109 S.Ct. at 2880, 106 L.Ed.2d at 177. Furthermore, with no actual record of the warning, the court had no grounds, beyond the officer's own testimony concerning his first-hand impressions, to find that the petitioner comprehended those warnings as administered. The majority, thus, should have held that the *Miranda* warnings were insufficient.

The inadequacy of the *Miranda* warnings necessarily invalidates the petitioner's subsequent waiver of his rights, which is

required to be knowing and intelligent, that is, "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421. Because the evidence does not support a conclusion that the petitioner comprehended his rights as they were read to him by Trooper Torres, it was error for the suppression court to conclude that his waiver was valid, as he could not have fully understood those rights, nor the consequences of waiving them. By affirming the conclusion of the suppression court, the majority improperly places the burden of demonstrating a lack of comprehension on a defendant who is administered *Miranda* warnings in a language that is foreign to him or her. The majority has, in essence, created a presumption of comprehension in favor of the State, and has done so under circumstances that clearly favor an opposite conclusion, and at the expense of the petitioner's Fifth Amendment rights. This is a clear contradiction of *Miranda's* prophylactic purpose.

I dissent.

Judges HARRELL and GREENE authorize me to state that they join in the views expressed in this dissenting opinion.