**STATE of Missouri, Respondent,**

v.

**Rebecca Lynn HARRIS, Appellant.**

**No. ED 91935.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 2, 2010.

William M. Byrnes, St. Charles, MO, Brian E. Zink, Lake St. Louis, MO, for Appellant.

Chris Koster, Attorney General, Jayne T. Woods, Asst. Attorney General, Jefferson City, MO, for Respondent.

Before SHERRI B. SULLIVAN, P.J. and ROBERT G. DOWD, JR., and PATRICIA L. COHEN, JJ.

PER CURIAM.

Rebecca Lynn Harris ("Defendant") appeals from the judgment upon her conviction by a jury of one count of second degree assault, Section 565.060, RSMo 2000 [1]. Defendant argues the trial court erred in (1) denying her motion to suppress statements, (2) overruling her counsel's motion to exclude the late endorsement of witnesses, (3) allowing the video deposition of the State's expert witness to be played for the jury without redacting the witness's legal conclusion, and (4) allowing the double hearsay testimony of Detective James Presson ("Detective Presson"). We reverse and remand.

In the light of the record viewed in its entirety, the following facts were adduced at trial. Caprina ("Mother") and Aaron ("Father") Wakefield hired Defendant as an in-home nanny for their two children, A.W., who was about two years old at the time of the incident, and the victim, who was about four months old at the time of the incident. Defendant began working for Mother and Father on October 1, 2007.

On October 26, 2007, Defendant arrived for work at about 1:30 p.m. Father talked to Defendant about the children's activities for that day, which included nothing out of the ordinary.

At 4:56 p.m., Defendant called 911 because the victim was not breathing. After paramedics arrived, the victim was transported to the hospital. The victim sustained serious injuries.

Later in the evening of October 26, 2007, Detectives Presson and Jay Hultz contacted Defendant at her boyfriend's house to try to find out what had happened that

day. Defendant gave the detectives the sequence of events that day, and she stated that when she realized something was wrong with the victim, she blew in his face and gently shook him trying to get him to respond. Defendant also agreed to go to the police station to give a written statement.

Defendant was later arrested on November 29, 2007 and was taken to the police station. Detective Presson placed her in an interview room and explained her constitutional rights to her using a form prepared by the prosecutor's office. Defendant then talked at length to the detectives.

Subsequently, Defendant filed a motion to suppress arguing that she was questioned without being adequately advised of her rights. This motion was denied after an evidentiary hearing. The video of Defendant's interrogation was played for the jury and her written statement was admitted into evidence at trial.

Defendant was convicted of one count of second-degree assault and was sentenced to seven years of imprisonment and received a fine of $3,000.00. This appeal follows.[2]

In her first point, Defendant argues the trial court erred in denying her motion to suppress statements and in admitting the statements at trial because the admission of such statements was in violation of Defendant's right to be free from self-incrimination and her right to counsel.[3] Defendant maintains the statements were made while she was being interrogated by Detective Presson and after she

---

1. All further statutory references are to RSMo 2000 unless otherwise indicated.

2. We hereby grant the State's Motion to strike portions of the second legal file because they were not the original exhibits marked and submitted to the trial court.

3. We note that this matter was properly preserved because Defendant filed a motion to suppress her statements. Further, at trial, Defendant objected when the statements were introduced. Lastly, Defendant included this issue in her motion for new trial.

had requested counsel several times throughout the interrogation. We agree.

We will affirm the trial court's ruling on a motion to suppress unless the ruling was clearly erroneous. *State v. Williams*, 277 S.W.3d 848, 851 (Mo.App. E.D.2009). If the ruling is plausible, in light of the record viewed in its entirety, we will not reverse, even if we would have weighed the evidence differently. *Id.* We defer to the trial court's superior opportunity to determine the credibility of witnesses and to make factual findings. *State v. Haslett*, 283 S.W.3d 769, 783 (Mo.App. S.D.2009). We review questions of law *de novo.* *Id.* We review the factual findings only to determine if they are supported by substantial evidence, viewing the facts in the light most favorable to the trial court's ruling and disregarding contrary evidence and inferences. *Williams*, 277 S.W.3d at 851. At trial, the State has the burden of production and persuasion to show by a preponderance of the evidence that a defendant's motion to suppress should be overruled. *State v. Ramires*, 152 S.W.3d 385, 395 (Mo.App. W.D.2004).

■■■ To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, the police must terminate their interrogation of an accused in custody if the accused requests the assistance of counsel. *State v. Harrison*, 213 S.W.3d 58, 68 (Mo.App. S.D.2006); *see also Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)(where the Court found if an accused invokes her right to counsel, all interrogation must cease until the Defendant consults with a lawyer, unless the accused initiates further communications with the police). The accused cannot be subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id.* Officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. *Id.*

■■■ To invoke a right to counsel pursuant to the Fifth Amendment, one must make an unambiguous, unequivocal and specific request for counsel. *State v. Kerr*, 114 S.W.3d 459, 463 (Mo.App. S.D.2003). Determining whether the right to counsel has been violated during a custodial interrogation requires a two-step analysis. *State v. Lanos*, 14 S.W.3d 90, 94 (Mo.App. E.D.1999). First, we must determine whether an accused invoked his or her right to counsel. *Id.* Second, if an accused invoked his or her right to counsel, we must determine whether the accused knowingly, voluntarily, and intelligently waived the previously invoked right to counsel. *Id.* To invoke the right to counsel, an accused must make an unambiguous and specific request for counsel in dealing with a custodial interrogation. *Id.* In other words, the right to not be questioned without counsel attaches only if the defendant indicates a desire for the assistance of counsel in his dealings with the police. *State v. Reese*, 795 S.W.2d 69, 72 (Mo. banc 1990). The question of whether an accused has invoked the right to counsel is objective. *Lanos*, 14 S.W.3d at 94. An accused must articulate his or her desire to have counsel present sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney. *Id.* If the statement fails to meet the requisite level of clarity for the police officers to understand it to be a request for an attorney, the officers are not required to stop questioning the suspect. *Davis v. U.S.*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

At the beginning of her interview, Detective Presson explained to Defendant her rights using a form and asked her to initial

next to them if she understood them. When Detective Presson was explaining that Defendant could stop talking to him at any time, the following exchange took place:

> [Detective Presson]: You have a right to talk to a lawyer for advice before we ask you any questions and to have the lawyer present with you during questioning. Do you understand that? If you cannot afford to hire one, a lawyer will be appointed for you before your questioning if you so desire. Do you understand that?

In response to these questions, Defendant initialed the form indicating she understood these rights. The questioning then continued as follows:

> [Detective Presson]: If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time, for any reason. You also have the right to stop answering questions at any time until you talk to a lawyer, you understand that?
>
> [Defendant]: No.
>
> [Detective Presson]: What it's saying is if you decide to answer questions now, without a lawyer present, you still have the right to stop answering questions at any time.
>
> [Defendant]: Okay.
>
> [Detective Presson]: Okay. And that's for any reason. So basically saying you can stop talking to me at any time. Okay? What you're, what you're, when you're initialing off, you're saying you understand that, you're going to be willing to talk to me, okay? But you know that you can stop at any time if you want to.
>
> [Defendant]: I'd rather appoint a lawyer.
>
> [Detective Presson]: huh?
>
> [Defendant]: I'd rather appoint a lawyer.

[Detective Presson]: Do you have a lawyer?

[Defendant]: No.

[Detective Presson]: Or are you trying to get one appointed for you?

[Defendant]: Yeah.

[Detective Presson]: Okay, now, one getting appointed for you doesn't happen like right now, okay? I want you to make sure that you understand that. We just don't, I mean, if you're going to have to get an attorney or someone appointed, that doesn't just happen right now. Because you have to apply for an attorney, you can't—

[Defendant]: I understand.

[Detective Presson]: Can you not afford an attorney? Is that what it is?

[Defendant]: No.

[Detective Presson]: Can't afford one? Do you want me to read it out loud again to you?

[Defendant]: Hmm?

[Detective Presson]: Do you want me to read it out loud again to you?

[Defendant]: That's fine.

[Detective Presson]: Okay. It says, "If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time, for any reason." Okay? "You also have the right to stop answering questions at any time until you talk to a lawyer."

[Defendant]: So I can talk to a lawyer at any time, just not right now? Cause you don't have one.

[Detective Presson]: You can talk to a lawyer at any time. I was just trying to explain to you that to you have, for you to have an attorney appointed to you, they just don't, we don't have anybody down the hallway. Okay? That is something that, when you are trying to get an attorney, you have to show them that

you don't have the financial stuff. So, for us to get you a—

[Defendant]: Can you appoint one for me?

[Detective Presson]: I can't. You have to go down and apply through them, or you have to retain your own attorney. You can talk to an attorney at any time you want to, but I am just telling you.

[Defendant]: So I can talk to an attorney any time now?

[Detective Presson]: I'm sorry?

[Defendant]: You're telling me I can talk to an attorney any time now?

[Detective Presson]: That's correct, but I just, I just don't want you to think we're going to call somebody down the hallway

[Defendant]: I understand.

[Detective Presson]: Okay. They have to, that's something you have to go apply for. Let me ask you, now, do you understand that?

[Defendant]: Not really, I don't understand the question.

[Detective Presson]: Okay. And what it's saying is, again, if you decide to answer questions now, without a lawyer, you still have the right to stop answering questions at any time. Okay? You also have the right to stop answering questions at any time, until you talk to a lawyer, at anytime until you talk to a lawyer.

[Defendant]: Well, what if I don't get to talk to a lawyer?

[Detective Presson]: I'm sorry?

[Defendant]: Well, what if I don't get to talk to a lawyer?

[Detective Presson]: What if you don't get to—

[Defendant]: Mm-hmm to an attorney?

[Detective Presson]: Have you had a chance to talk to an attorney yet?

[Defendant]: No.

[Detective Presson]: You haven't talked to one? Okay, I, I guess where I am trying to go, get to this is that you can talk to an attorney at any time, okay?

[Defendant]: Okay. Okay.

[Detective Presson]: And that you can stop talking to me at any time until you talk to an attorney.

[Defendant]: Okay, I understand that.

At this point, Defendant initialed the form. Then the conversation continued as follows:

[Detective Presson]: Okay, this is the waiver. I understand what my rights are. I'm willing to answer questions and make a statement knowing I have these rights. I do not want a lawyer at this time. I understand and know what I am doing. No promises have been made to me. No threats have been made against me or my family. No pressure of any kind has been used against me. No promises of reward or immunity have been made. Do you understand that?

[Defendant]: But what if I want to talk to a lawyer? So you are saying I can't talk to a lawyer because I don't have one.

[Detective Presson]: No, I am saying you can talk to a lawyer any time you want to. Okay? What I am saying is that, for one, you have to qualify to get an attorney, unless you have one already that you paid or that you know and stuff like that, okay? I'm not denying you an attorney, okay? Umm, when I told you, you know that we had to verify and go over some of the things that you told us, okay? That was the whole point of us talking with you today.

[Defendant]: So the only reason why you are doing this is because of my rights.

[Detective Presson]: That's correct.

[Defendant]: Okay, so you have to do it no matter what.

[Detective Presson]: Right, and like I said, you can have an attorney anytime you want to, you can stop talking to me anytime you want to, you can exercise any of these rights at any time you want to is what we are trying to get across here, okay?

[Defendant]: Okay.

[Detective Presson]: I'm not telling you you can't have an attorney.

At this point, Defendant initialed the waiver. Detective Presson then asked her "are you wanting to talk to me now?" Defendant responded that she did want to talk to him. Detective Presson then asked her to sign the form, which she did.

Defendant was then interviewed by the police, and during the three-hour interview she made several incriminating statements. Defendant also executed a written confession. Defendant was charged and convicted of second-degree assault.

Defendant argues she invoked her right to counsel and Detective Presson violated her right by not ceasing the interview at that point.[4] Defendant further contends that at no point did she initiate further questioning. In *State v. Olds*, 569 S.W.2d 745, 752 (Mo. banc 1978), the court found the defendant asserted his right to remain silent and to obtain counsel, and thus, questioning should have ended until such time as he voluntarily changed his mind or counsel was present. In that case, after each question the defendant stated "[he] would like to contact [his] lawyer." *Id.* at 748–49. Because the State persisted in the questioning, the subsequent statements were rendered inadmissible. *Id.* In *Olds*, the defendant was very clear in his request to talk to a lawyer, and he repeated his request unequivocally several times, yet the police continued to ask him questions. *Id.* at 751.

In this case, Detective Presson told Defendant "a lawyer will be appointed for [her] before [her] questioning if [she] so desire[d]." Then as he was explaining that Defendant decided to answer questions without a lawyer present, she could stop answering question at any time until she talked to a lawyer, Defendant twice stated she would "rather appoint a lawyer." Detective then asked Defendant, ". . . are you trying to get [a lawyer] appointed for you?" Defendant responded, "Yeah." At this point, Detective Presson should have ceased his questioning of Defendant until she talked to a lawyer because she clearly and unequivocally invoked her right to counsel. However, Detective Presson continued to try to explain Defendant's rights to her. During the subsequent conversation, Defendant asked Detective Presson if he could appoint an attorney for her. Further, Defendant stated "But what if I want

---

**4.** The State tries to analogize this case to several cases where the defendant's request for counsel was found to be equivocal. However, all of those cases involved a question from the defendant about getting a lawyer, not a request for counsel. *See State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998)(where the defendant asked "Well do you think I should have an attorney present?" and "How fast could you get an attorney here?"); *State v. Scott*, 943 S.W.2d 730, 740 (Mo.App. W.D.1997)(where the defendant stated, referring to a lawyer, "Yeah, can you get me one," and then said, "I'll wait . . .," and then, "Let's continue."); *State v. Jones*, 914 S.W.2d 852, 860 (Mo.App. E.D. 1996)(where, as the defendant was being interviewed, he answered several questions by saying, "Do I need an attorney?"); and *State v. Wilkinson*, 861 S.W.2d 746, 749 (Mo.App. S.D.1993)(where the defendant claimed he invoked his right to counsel by asking "Could [he] call [his] lawyer?"). On the other hand, this case involved several statements that Defendant wanted an appointed lawyer, which were not equivocal, and were a clear invocation of her right to counsel.

to talk to a lawyer? So you are saying I can't talk to a lawyer because I don't have one."

Ultimately, Detective Presson got Defendant to agree to talk to him and to sign a waiver form. Detective Presson went on to interrogate her, and Defendant made incriminating statements. However, although Defendant eventually agreed to talk to Detective Presson and signed the form waiving her rights that does not vitiate the fact that she invoked her right to counsel and that right was violated when Detective Presson continued questioning her.

In *State v. Gibson*, 623 S.W.2d 93, 97 (Mo.App. W.D.1981) a defendant asked for a lawyer and then as the police ignored his request and continued to ask questions, the defendant acquiesced and answered the questions. To invoke his right to counsel, the defendant stated "he ought to get a lawyer" and "I think I need an attorney." *Id.* at 96. The court there found the defendant unequivocally invoked his right to counsel and his subsequent acquiescence as the questioning continued did not constitute a voluntary, knowing, and intelligent waiver of his right to remain silent or his right to talk to an attorney. *Id.*

The United States Supreme Court has held that using an accused's subsequent responses to cast doubt on the adequacy of the initial request for counsel is intolerable. *Smith v. Illinois*, 469 U.S. 91, 99, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). In that case, the police said to the accused "You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?" *Id.* at 93, 105 S.Ct. 490. The accused responded "Uh, yeah. I'd like to do that." *Id.* The police did not cease questioning at that point, but instead they finished explaining to the accused his rights. *Id.* Once they finished, the police asked the accused "Do you wish to talk to me at this time without a lawyer being present?" *Id.* The accused responded "Yeah and no, uh, I don't know what's what, really." *Smith*, 469 U.S. at 93, 105 S.Ct. 490. The police then stated "Well. You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to." *Id.* The accused responded "All right. I'll talk to you then." *Id.* The Court found the accused had unambiguously asserted his right to counsel and that his post-request responses to further interrogation could not be used to cast retrospective doubt on the clarity of the initial request. *Id.* at 100, 105 S.Ct. 490.

Here, Defendant unequivocally invoked her right to counsel when she stated twice that she would rather appoint a lawyer and when she responded that she was trying to get a lawyer appointed for her. Detective Presson's subsequent questions and Defendant's subsequent statements cannot be used to cast doubt on her initial request.[5]

Therefore, in light of the record viewed in its entirety, we find the trial court's ruling was clearly erroneous because Defendant unequivocally and unambiguously

5. We note the Court's statement in *Davis* that when a suspect makes an ambiguous or equivocal statement, it will often be good police practice for the interviewing officers to clarify whether or not he or she actually wants an attorney. *Davis*, 512 U.S. at 461, 114 S.Ct. 2350. Clarifying questions help protect the rights of the suspect by ensuring that she gets an attorney if she wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. *Id.* However, where, as here, Defendant makes an unequivocal request, all questioning must cease until she can speak to a lawyer. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

invoked her right to counsel. As a result, the police should have immediately ceased questioning until either Defendant initiated further communications or was able to confer with her counsel. Instead the police continued to interrogate Defendant, which violated her rights under the Fifth Amendment, and any statements resulting from this interrogation should have been suppressed. Thus, the trial court erred in denying Defendant's motion to suppress her statements and in admitting the statements at trial. Point granted.

Although Defendant's first point is dispositive, in the event of a re-trial on remand, the issue of allowing Dr. Maria Spivey's deposition to be played for the jury may recur, and we will address it here to guide the trial court. *See Muehlheausler v. City Of St. Louis*, 211 S.W.3d 153, 156 (Mo.App. E.D.2007).

In her third point, Defendant argues the trial court erred by allowing the video deposition of Dr. Maria Spivey to be played for the jury without redacting Dr. Spivey's legal conclusion because the statement invaded the province of the jury in that Dr. Spivey's testimony defined a term contained in a jury instruction. We disagree.

It is well-established that expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence. *State v. Calhoun*, 259 S.W.3d 53, 58 (Mo.App. W.D. 2008). In a criminal case, an expert may testify concerning his or her opinion on an ultimate issue, but the testimony must aid the jury and not invade the jury's province. *Id.* Expert testimony is inadmissible if it constitutes a conclusion of law. *State v. Candela*, 929 S.W.2d 852, 866 (Mo.App. E.D.1996).

Jury instruction number 7 provided that "a person acts recklessly as to causing serious physical injury if she consciously disregards a substantial and unjustifiable risk that her conduct will result in serious physical injury, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in this situation."

Dr. Spivey testified as follows:

Q: Have you read any studies that tell you exactly how much force is required to produce the injuries you have listed for [the victim], foot pounds of force?

A: The studies we know from-the studies that I have read from perpetrator confessions tell us that a—that a child who sustained these injuries it was with force that was—that a reasonable onlooker would know this is causing injury to a child.

Defendant argues Dr. Spivey invaded the province of the jury and rendered a legal conclusion regarding the culpable mental state of recklessness of Defendant. In particular, Defendant takes issue with Dr. Spivey's testimony that the amount of force necessary to cause the injury incurred was such that "a reasonable onlooker would know that this is going to cause injury." Defendant objected because she believed the reasonable person standard espoused by Dr. Spivey invaded the province of the jury. Defendant maintains Dr. Spivey's testimony of her experience in these types of cases leads to an inference that she knew the mental state and intent of Defendant.

The purpose of expert testimony is to assist the jury in areas which are outside of everyday experience or lay experience. *State v. Hayes*, 88 S.W.3d 47, 61 (Mo.App. W.D.2002). Expert testimony is admissible on subjects about which the jurors lack experience or knowledge. *Id.* An expert may testify to his or her opinion

regarding an ultimate issue in a criminal case, as long as the expert does not express an opinion on the guilt or innocence of the defendant. *State v. Candela*, 929 S.W.2d 852, 867 (Mo.App. E.D.1996).

Defendant relies primarily on *State v. Clements*, 789 S.W.2d 101 (Mo.App. S.D. 1990). In that case, the doctor testified as to whether the defendant deliberated in committing the murder, which was an ultimate issue for the jury to determine according to the instructions. *Id.* at 110. The court found the trial court committed plain error in admitting that testimony. *Id.* at 111.

Here, Dr. Spivey's testimony regarding the amount of force required to inflict injuries such as those sustained by the victim was a matter outside the common experience of the jurors. Dr. Spivey merely commented on the ultimate issue of the cause and nature of the victim's injuries; she did not comment on Defendant's responsibility for those injuries. Defendant's reliance on *Clements* is misplaced.

Therefore, the trial court did not err by allowing the video deposition of Dr. Spivey to be played for the jury without any redactions. Point denied.

We need not address Defendant's remaining claims of error.

The judgment of the trial court is reversed and remanded.