*Vargas-Salguero v. State*, No. 159, September Term 2017. Opinion by Nazarian, J.

**FIFTH AMENDMENT – RIGHT TO COUNSEL – INVOCATION**

Where a defendant invokes his right to counsel on a condition that in context would, to the reasonable police officer, have clearly been met, the request for counsel was unequivocal and unambiguous and further interrogation by officers after that point violates the defendant's Fifth Amendment rights. A reasonable officer must take into account who is speaking and what his words reasonably meant to convey.

**FIFTH AMENDMENT – RIGHT TO SILENCE – INVOCATION**

Where a defendant invokes his right to silence and officers continue interrogation, the defendant's Fifth Amendment rights have been violated. The trial court should take into account what the interrogation video actually shows, and not merely the officers' interpretation of their actions at the suppression hearing.

Circuit Court for Prince George's County
Case No. CT141464X

MYNOR VARGAS-SALGUERO

v.

STATE OF MARYLAND

Nazarian,
Reed,
Beachley,

JJ.

Opinion by Nazarian, J.

Filed: June 1, 2018

> Craig Kettleman: I just think I'd look guilty if I hired a lawyer.
>
> James McGill: No, actually it's getting arrested that makes people look guilty, even the innocent ones, and innocent people get arrested everyday. And they find themselves in a little room with a detective who acts like he's their best friend. "Talk to me," he says, "Help me clear this thing up. You don't need a lawyer, only guilty people need lawyers" and BOOM! Hey, that's when it all goes south. That's when you want someone in your corner. Someone who will fight tooth and nail.[1]

We all know (from television, if nowhere else) that a person in custodial interrogation has the right to ask for counsel and that once that right is invoked, questioning must stop. The issue in this case is whether Mynor Vargas-Salguero invoked his right to counsel during questioning by Prince George's County detectives, and specifically whether the words he used conveyed that request with sufficient clarity and without ambiguity. The Circuit Court for Prince George's County found his words ambiguous, and, after a trial, he was convicted of second-degree murder, robbery, and theft. He argues on appeal that his Fifth and Sixth Amendment rights were violated when detectives continued questioning him after he invoked his rights to counsel and to remain silent. We hold Mr. Vargas-Salguero invoked his Fifth (not Sixth) Amendment rights when, under these circumstances, officers continued to question him after he asked (in Spanish) for a lawyer, and we reverse the judgment and remand for further proceedings.

## I.     BACKGROUND

On the night of September 2, 2014, Miguel Barillas (the "victim") was killed in Langley Park by a single stab wound to the chest. While investigating the murder,

---

[1] *Better Call Saul: Uno* (AMC television broadcast Feb. 15, 2015).

detectives discovered that Mr. Barillas's phone had been taken immediately before or right after the murder. Police tracked the phone to Jose Ventura, who explained that a man approached him and offered to sell it for $100. Mr. Ventura declined the offer, but loaned the man $100 and held the phone as collateral. The man gave Mr. Ventura his phone number so that he could retrieve the phone from Mr. Ventura later. That number belonged to Mr. Vargas-Salguero.

The police looked at the phone's call history and discovered a call to Glenda Matute, an acquaintance of Mr. Vargas-Salguero, that had been placed after the victim had died. When questioned, Ms. Matute told officers that Mr. Vargas-Salguero had called her late at night on September 2nd and offered to sell her the victim's phone. Ms. Matute and another eyewitness, Hugo Cordon, also identified Mr. Vargas-Salguero as the aggressor in an altercation between Mr. Vargas-Salguero and the victim; they said that Mr. Vargas-Salguero appeared to "punch" the victim before the men walked off in separate directions.[2]

Detectives obtained an arrest warrant for Mr. Vargas-Salguero early in the morning on September 6, 2014. The statement of charges included first-degree murder, robbery, armed robbery, and carrying a dangerous weapon with the intent to injure. They arrested him and brought him to an interrogation room, then began questioning him at about 2:45 a.m.

---

[2] Ms. Matute identified Mr. Vargas-Salguero in security camera footage that recorded the murder. Mr. Cordon saw the murder take place from his balcony.

Before describing the interrogation itself, though, a little context. Mr. Vargas-Salguero's first language is Spanish and he speaks some English. Two of the detectives interrogating Mr. Vargas-Salguero (Detectives Deleon and Rodriguez) spoke English and Spanish, and one (Detective Bellino) spoke only English. Most of the interrogation took place in Spanish, and the Spanish-speaking detectives occasionally translated or summarized for Detective Bellino. At times, though, Detective Bellino questioned Mr. Vargas-Salguero in English, and at other times Mr. Vargas-Salguero responded to them in English. The excerpts of the interrogation that follow come, except where otherwise noted, from the transcript prepared by the police, as they translated the discussion, but we have italicized the portions spoken in Spanish and added some further annotations to synchronize the transcripts with the actual interrogation as recorded on video. At the suppression hearing we discuss later, the circuit court had access to the video as well as the translated transcripts.

During the initial part of the questioning, Mr. Vargas-Salguero revealed that he had drunk alcohol and smoked marijuana the previous night, but he assured the detectives that he was sober as they spoke. Detective Deleon advised Mr. Vargas-Salguero of his *Miranda*[3] rights in Spanish. When asked if he understood his rights, Mr. Vargas-Salguero responded that he understood them perfectly. The detectives then asked Mr. Vargas-Salguero where he had been on the night of the murder, and told him (despite the arrest warrant) that he was not being accused of anything. Mr. Vargas-Salguero initially denied

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

being in Langley Park that night, but eventually admitted that he'd gone there to buy marijuana after work. He described (in Spanish) what happened next:

> [DETECTIVE DELEON]: *And after what did you do? When you smoked that joint that night*?
>
> A: *Open the door and get my ass in the house cause I know how to hot this shit*.
>
> [DETECTIVE DELEON]: *Okay, and then what happened*?
>
> A: *What do you mean what happened*?
>
> [DETECTIVE DELEON]: *Once you went inside the house, what happened*?
>
> A: *Sleep, like always*.
>
> [DETECTIVE DELEON]: *And what time did you wake up*?
>
> A: *I wake up—didn't I just tell you*?
>
> [DETECTIVE DELEON]: *No, the other day. Or I don't know if it's your day off*.
>
> A: *Excuse me but, you can ask me and repeat what you like and I'll answer how it is, okay? Because I don't owe you and haven't done anything to anyone. Okay? At 4:30 my sister gets up to (make) lunch. Okay*?
>
> [DETECTIVE DELEON]: *Okay*.
>
> A: *At 4:30 I get up, sometimes I shower in the afternoon or sometimes I shower in the morning. Okay? So, you know, I get up at 4:30…*
>
> [DETECTIVE DELEON]: *Every day*?
>
> A: *Not every day*.
>
> [DETECTIVE DELEON]: *That's why I asked you*.

4

A:     *Sometimes I get up at 4:30 when I take a shower.*

[DETECTIVE DELEON]: *Okay. Tha—that's why I asked you.*

A:     *At 5:30 my ride wakes me up, there at the house where I live—lived right now with my sister, that I just moved in.*

[DETECTIVE DELEON]: *Right.*

A:     *And I go to work. <u>That's all I have to say to you. And if you accuse me of something I better want an attorney</u>.* (underlining added).

That, at least, is how the police transcript translated this last sentence—in Spanish, he said "si me acusan de eso quiero un abogado mejor," and what he actually meant when he said it lies at the heart of this case.[4]

After the following short, non-substantive back-and-forth that switched between languages, detectives left the room for about three minutes:

[DETECTIVE DELEON]: *We're not—okay.*

A:     *Try to put me in jail. It doesn't matter. Pay for something I haven't done. That's fine. I feel clean and happy in my heart. I don't need to hurt anyone, that's why I work. That's why I earn my own money, (unintelligible) the rent and I'm clear that it's always me paying my rent where I lived before with my wife.*

---

[4] We have used the detective's translation of "quiero un abogado mejor" (offered in the transcript and at the suppression hearing) as "I better want an attorney" because that translation was not contested at the suppression hearing. Mr. Vargas-Salguero's brief contends that the officers' translation is convoluted, and that his words translate more directly as "I want a better lawyer." But the circuit court never considered alternate translations, and we will not do so here in the first instance (or employ our own amateur Spanish to that end). If Mr. Vargas-Salguero's translation is correct, though, his statement invoked his right to counsel even more clearly.

5

[DETECTIVE BELLINO]: Why are you so angry, man?

A:     No I'm not angry 'cause…I'm sorry, man.

[DETECTIVE BELLINO]: We're not coming at you like that, man.

A:     I'm sorry man. Forgive me.

[DETECTIVE BELLINO]: Don't be angry, man.

A:     That's the way I am, brother. I'm sorry I know you're not my brother, but that's the way I am. I'm sorry. Okay I'm not…

[DETECTIVE DELEON]: Okay. We'll be right back.

When they returned, Mr. Vargas-Salguero was crying and emotionally distraught. Detective Bellino asked Mr. Vargas-Salguero if he was "all right," to which he answered, rhetorically, "[h]ow do you think I feel?" So the Detective offered, "Listen, if you – if you want to talk to me, I'm willing to talk," then laid down surveillance photos from the night of the murder on the table where Mr. Vargas-Salguero could see them:

A:     Right. Ask me whatever you want.

[DETECTIVE BELLINO]: Okay. Maybe…

A:     *People confuse me and—this has to be this way, man.*

[DETECTIVE BELLINO]: Hold up, just a moment ago you said **you wanted a lawyer but**[5] you're willing to talk to us right now, right?

---

[5] The bolded text represents the words Mr. Vargas-Salguero spoke during the interrogation—as the circuit court and we can see on the video—that the police left out of the transcript they prepared and submitted to the court. Where, as here and in one other important place, the transcript and the video conflict, we will fall back on the video.

The record does not reveal, nor do the police explain, why their transcript deviates from the interrogation. The discrepancies were not identified to the circuit court, and the court

> A:       Yeah because I don't have no problem.
>
> [DETECTIVE BELLINO]: And you understand you have the right to remain silent, you understand you have the right to have an attorney, but you're willing to talk to us correct?
>
> A:       I want to fix it. I want to fix it.

Shortly after this exchange, Mr. Vargas-Salguero confirmed that it was he in the surveillance photos. A bit later in the interview, Mr. Vargas-Salguero stated he had nothing else to say, and this time the detectives were the first to speak:

> A:       *In what moment did – did – I don't want to say anything else now. Because I have nothing else to say. I have nothing else to tell you. Me, killing a poor man*. (unintelligible.)
>
> [DETECTIVE BELLINO]: Go ahead here.
>
> [DETECTIVE DELEON]: *Here*.
>
> A:       There, what? Go ahead, what? What you got in there? What do you say? *I don't see anything there. Nothing*.
>
> [DETECTIVE BELLINO]: **Look are you willing to talk to us? I thought you said you didn't want to talk.**[6] Do you want to talk to me? Are you willing to talk to me?
>
> A:       Yeah.

---

made no findings about them; the court reviewed both the transcript and the video, and thus could consider the full interrogation, but didn't address the differences. We cannot help but notice, however, that the officers' transcript omitted words Mr. Vargas-Salguero in fact said at two critical points in the interrogation, and that the omitted language bears directly on whether the officers understood that Mr. Vargas-Salguero invoked his rights to counsel and to remain silent. We cannot determine from this record whether the officers created a misleading transcript intentionally, but we might well have been misled had we not reviewed the video ourselves.

[6] The police-prepared transcript says only "I understand you want to talk."

[DETECTIVE BELLINO]: All right because, you know. Here's the thing, first of all, you want to talk to me I'll repeat everything I already explained to you, you have the right to a lawyer, you have the right to remain silent, you're willing to speak to me, is that right?

A:     Yeah because I don't have any.

And the words alone don't paint a complete picture of what was happening in the interrogation room. Mr. Vargas-Salguero's statements in Spanish that he had nothing else to say ("*In what moment did – did – I don't want to say anything else now. Because I have nothing else to say. I have nothing else to tell you.*") were not translated by Detective DeLeon for Detective Bellino. At that point, Detective DeLeon pushed away from the table ("Here.") to allow Detective Bellino to lean over and continue speaking to him, at which point he said, in English, "Look are you willing to talk to us? I thought you said you didn't want to talk. Do you want to talk to me?"

From there, the interrogation continued, and over the course of the next two hours, Mr. Vargas-Salguero's story changed. He eventually admitted to knowing the victim through neighborhood pick-up soccer games. He also admitted that he had been in Langley Park that night buying drugs, but hadn't returned home right away. Instead, he drank with an acquaintance named Chano, who gave him the victim's cell phone. Later, Mr. Vargas-Salguero admitted that he took the phone himself, but claimed that the victim was passed out drunk or sleeping at the time. Finally, Mr. Vargas-Salguero confessed that he'd approached the victim who "was just there sitting" and said, "Give me your phone." The victim apparently "tried to go off running" but Mr. Vargas-Salguero "push[ed] him down." Then, he "took it away from [the victim], [I] hit him once, he fell, I grabbed the phone and

8

left." Mr. Vargas-Salguero stated that he thought he made a call on the victim's phone, but couldn't remember to whom.

Mr. Vargas-Salguero was charged by criminal indictment with first-degree murder, armed robbery, and carrying a dangerous weapon openly with intent to injure. Before trial, he moved *in limine* to suppress the statements he made to the detectives in the early morning interview on September 6th. He argued that his statements to the detectives were not knowing and voluntary and that the detectives violated his Fifth and Sixth Amendment rights. The transcript of Mr. Vargas-Salguero's interrogation was prepared in English by one of the detectives who conducted the interview and was admitted without objection at the hearing on the motion to suppress. The detectives who conducted Mr. Vargas-Salguero's initial interview also testified in person.

At the hearing, Mr. Vargas-Salguero focused primarily on challenging the voluntariness of his confession due to his alcohol and drug use the night before. He also asked the detectives about his request for an attorney. The detectives were provided with copies of the transcript and viewed relevant portions of the interview video. Detective DeLeon claimed that Mr. Vargas-Salguero hadn't been under arrest at the time he was questioned, but acknowledged that they had given him *Miranda* warnings all the same. Detective DeLeon also acknowledged that Mr. Vargas-Salguero had mentioned an attorney at least once during their interview, but said that it hadn't been clear to him that Mr. Vargas-Salguero was requesting one:

> [DEFENSE COUNSEL]: Okay. And is it fair to say each time the word attorney came out of his mouth, he was not Mirandized and you continued to ask questions?

DETECTIVE DELEON: That's false.

[DEFENSE COUNSEL]: Which part is false?

DETECTIVE DELEON: That I continued to ask questions. If we go back where he says on Line 1096, I better want an attorney, at that point, he doesn't say to me – that was very unclear of what he was asking. I wasn't sure and I was going to ask him, then he cut me off when I was going to ask him what did he mean by that. He continued talking. And if we watch the video, I never asked him another question.

And I said to Detective Bellino, said, hey, I need to speak to you outside, because I was unsure and we could – it happened so quick where I wasn't sure what he said. So I didn't ask any questions about anything else and I asked him to step out and I advised him, I said, hey, I heard the word. I'm not sure what happened.

* * *

STATE: Do you recall whether or not the defendant mentioned the word attorney ever again?

DETECTIVE DELEON: I'm not sure. I'd have to go through it.

STATE: Okay. But at this point when he said, if you accuse me of something, I better want an attorney, was that clear to you?

DETECTIVE DELEON: No, it wasn't.

STATE: And how do we know it wasn't clear to you?

DETECTIVE DELEON: Because I was going to ask him what he meant, but then he kind of interrupted me, then just kept on talking.

* * *

STATE: When you came back into the room, who started talking first?

10

DETECTIVE DELEON: Detective Bellino.

STATE: And what was the defendant's response?

DETECTIVE DELEON: He just said he wants to talk.

STATE: And was that in response to any questions posed by Detective Bellino about the case?

DETECTIVE DELEON: No.

* * *

STATE: According to Line 1039, what does the defendant say?

DETECTIVE DELEON: He said, ask me whatever you want.

STATE: And at that point, what does Detective Bellino do?

DETECTIVE DELEON: He asks him if he's willing to talk to us.

STATE: And what, if anything, does Detective Bellino do after that?

DETECTIVE DELEON: He advises him of his right to an attorney and if he's willing to talk to us.

STATE: And what, if anything, did the defendant do after that?

DETECTIVE DELEON: He said, yes. He wants to fix it.

STATE: And did the defendant ever indicate to you that he didn't understand what Detective Bellino said in English?

DETECTIVE DELEON: No.

STATE: Did the defendant ask you to translate for Detective Bellino?

DETECTIVE DELEON: No.

11

STATE: And [defense counsel] asked you whether or not the defendant asked for any clarification and your answer was yes, right?

DETECTIVE DELEON: Yes.

STATE: Other than what we'd spoken about where he asked you about the cost of the attorney, did the defendant ask any other clarifying questions about his Miranda Rights?

DETECTIVE DELEON: No.

Detective Bellino also testified that he found Mr. Vargas-Salguero's invocations of his rights to an attorney ambiguous:

STATE: Did there ever come a time when he expressed to you that he wanted the services of an attorney?

DETECTIVE BELLINO: No.

STATE: Now, did there come a time when you read him his Miranda Rights in English?

DETECTIVE BELLINO: Yes.

STATE: Why did you do that?

DETECTIVE BELLINO: I guess just prior to this point in the video, he made a statement in Spanish to Detective Deleon that was ambiguous – I mean essentially what I termed to be ambiguous although we don't have the benefit of rolling back the video to watch it. So I proceeded cautiously and then re-advised him just to confirm that he understood his rights and was still willing to speak to us.

STATE: [] So what was your purpose in re-advising him?

DETECTIVE BELLINO: Well, essentially to confirm that he understood his rights.

[THE VIDEO WAS PLAYED]

12

STATE: So what just happened here, Detective? []

DETECTIVE BELLINO: Essentially stopped him, asked him – basically I asked him if, in fact, he did want to speak to us and if, in fact, he understood his rights and to confirm that he, in fact, was willing to speak with us.

STATE: Now, what was his response?

DETECTIVE BELLINO: That he was.

STATE: And when you walked in, what kind of questions are you asking him?

DETECTIVE BELLINO: When I entered, he was crying. You could tell he was emotionally distraught, so initially my entry was just basically to check on his welfare.

So I asked him, are you okay? And then with me, I had a photograph from the surveillance footage that had just been given to me and he looked at the photograph and said something to the effect of that's me, identifying himself in the picture.

STATE: And was that in response to any question that you had asked him?

DETECTIVE BELLINO: No. I made no mention of the photograph and didn't ask him anything about the photograph.

STATE: In fact, the question was, how do you feel?

DETECTIVE BELLINO: Correct.

STATE: And his response to you was?

DETECTIVE BELLINO: Yeah. He pointed to the photograph and said, yeah, that's me.

STATE: And did there come a time when you advised the defendant of his Miranda Rights again?

13

DETECTIVE BELLINO: Yes. I believe it was a second time beyond this where I made similar statements.

* * *

[THE VIDEO WAS PLAYED]

STATE: Detective Bellino, what just occurred?

DETECTIVE BELLINO: I asked him whether or not he was willing to talk to us and he was going to talk to me.

STATE: And when he said yes, he was, what did you do in an abundance of caution?

DETECTIVE BELLINO: Re-advised.

[THE VIDEO WAS PLAYED]

STATE: And when you re-advised the defendant of his Miranda Rights, what did the defendant say in response?

DETECTIVE BELLINO: Go ahead. Essentially he's willing to continue speaking to me.

STATE: And the rest of the time that you spoke to the defendant, did he ever ask you for an attorney?

DETECTIVE BELLINO: No.

STATE: Did he ever tell you that he did not wish to speak to you in English or in Spanish?

DETECTIVE BELLINO: He did not.

STATE: And did he ever indicate to you that he was not voluntarily speaking to you?

DETECTIVE BELLINO: No, he did not.

STATE: Was the defendant charged?

DETECTIVE BELLINO: He was.

14

STATE: When was he charged?

DETECTIVE BELLINO: I believe after our interview.

The trial court considered all of the testimony, the transcript of the interview, and the relevant excerpts of the recorded interview and denied the motion to suppress.

After a jury trial, Mr. Vargas-Salguero was acquitted of first-degree murder, second-degree murder, robbery with a deadly weapon, and carrying a dangerous weapon openly with intent to injure. The jury hung on the charge of first-degree felony murder, but convicted him of second-degree felony murder, robbery, and theft. The robbery and theft charges were later merged into his conviction for second-degree felony murder. A timely notice of appeal followed.

## II. DISCUSSION

Mr. Vargas-Salguero raises three issues on appeal that collapse naturally into the broader question of whether the trial court properly denied his motion to suppress.[7] He argues *first* that he invoked his Fifth Amendment rights to silence and to an attorney and

---

[7] In his brief, Mr. Vargas-Salguero phrased the Issues Presented as follows:

(1) Whether detectives violated Mynor Vargas-Salguero's Sixth Amendment right to counsel by deliberately eliciting information from him despite his clear request for an attorney.

(2) Whether detectives violated Mynor Vargas-Salguero's Fifth Amendment right to counsel by questioning him and engaging in behavior that was the functional equivalent of questioning despite his clear request for an attorney during custodial interrogation.

(3) Whether detectives violated Mynor Vargas-Salguero's Fifth Amendment right to silence by questioning him and engaging in behavior that was the functional equivalent of questioning despite his clear requests to remain silent.

15

that both were disregarded by detectives during questioning. The State responds that Mr. Vargas-Salguero's invocations were ambiguous and, therefore, didn't trigger his rights. *Second*, Mr. Vargas-Salguero argues that his Sixth Amendment right to counsel was violated after the detectives ignored his request for an attorney and continued to question him. The State contends that the Sixth Amendment challenge was not argued in the circuit court and thus not preserved, and also that his Sixth Amendment right to counsel had not attached at the time of the interrogation.

When we review a trial court's denial of a motion to suppress, we limit our review to the record of the suppression hearing, *Holt v. State*, 435 Md. 443, 457–58 (2013), and consider the evidence in the light most favorable to the prevailing party. *Gonzalez v. State*, 429 Md. 632, 648 (2012). We will not disturb the trial court's factual findings unless clearly erroneous, *Gonzalez*, 429 Md. at 648, but we use those facts to make our "own independent constitutional appraisal[.]" *Longshore v. State*, 399 Md. 486, 499 (2007) (cleaned up).

### A.     Mr. Vargas-Salguero Invoked His Fifth Amendment Rights.

The Fifth Amendment protects a defendant from being "compelled in any criminal case to be a witness against himself." *Miranda*, 384 U.S. at 444. These protections include the right by defendants in custody to remain silent and to have an attorney present on request. *Id.* Officers are required to give *Miranda* warnings to defendants in custody to warn "the person [] that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights may be waived if "the waiver is made

16

voluntarily, knowingly and intelligently," *id.*, but "[i]f the [defendant] states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474. If the warnings are not given or the police officers fail to respect the person's proper invocation of their rights, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from [the] custodial interrogation of the defendant []." *Id.*

A defendant in custody is entitled to invoke these rights, but must do so with sufficient clarity. The invocation cannot be "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might be* invoking [a Fifth Amendment right]," and "if the statement fails to meet the requisite levels of clarity [then it] does not require that the officers stop questioning the suspect." *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis added). Furthermore, officers are not required to ask clarifying questions to determine if the defendant is asserting his rights. *Wimbish v. State*, 201 Md. App. 239, 251 (2011).

There is no dispute between the parties that Mr. Vargas-Salguero's interview on September 6th constituted a custodial interrogation: he was properly detained pursuant to an arrest warrant supported by probable cause. Furthermore, Mr. Vargas-Salguero has not argued on appeal that the *Miranda* warning he was given at the beginning of his interview was improper, or that his waiver of those rights was not knowing and voluntary. The question for us is whether Mr. Vargas-Salguero unambiguously invoked any of his Fifth Amendment rights during that interview such that the officers were required to stop questioning him. We hold that he did invoke his right to counsel and to remain silent and that the detectives erred in continuing to question him.

17

## 1. Mr. Vargas-Salguero invoked his Fifth Amendment right to counsel.

Mr. Vargas-Salguero asserts that he invoked his Fifth Amendment right to an attorney when he said, in Spanish, "si me acusan de eso quiero un abogado mejor." The overarching principle guiding our review is that "[a] statement either is [] an assertion of the right to counsel or it is not," and we judge the ambiguity of a defendant's statement by what the reasonable police officer in those circumstances would have understood the statement to mean. *Davis*, 512 U.S. at 459.

The statement at issue here has two components that we need to unpack: the conditional opening ("if I am being accused of something") followed by the request itself ("I better want an attorney"). The first half of the sentence stated a condition, and a colloquial preface or qualifier *can* render a statement ambiguous. But the statement's ultimate clarity depends on its context. In *Ballard v. State*, the Court of Appeals held that that defendant's request—"You mind if I not say no more and just talk to an attorney about this"—unequivocally invoked his right to counsel. 420 Md. 480, 482, 485, 491, 492–93 (2011). There, "[t]he phrase 'you mind if . . .' in [that] context [was] a colloquialism; it is reasonably assumed that the speaker [was] not actually seeking permission to do the thing desired or to have the desired thing occur." *Id.* at 492–93. The Court distinguished three other cases[8] in which the defendant had equivocated, noting that "[n]one of the statements

---

[8] *See id.* at 491–92 (distinguishing *Davis v. United States*, 512 U.S. 452, 462 (1994) ("Maybe I should talk with a lawyer?"), *Matthews v. State*, 106 Md. App. 725, 737-38 (1995) ("Where's my lawyer?"), and *Minehan v. State*, 147 Md. App. 432, 443-44 (2002) ("Should I get a lawyer?")).

under consideration in [earlier 5th Amendment invocation cases] . . . provide[d] any indication that the suspect, at the time the statement was uttered, *actually desired to have a lawyer present for the remainder of the interrogation.*" *Ballard*, 420 Md. at 492 (emphasis added).

The key is whether the defendant expresses a desire to have a lawyer present for the interrogation, as opposed to mentioning the idea of having a lawyer present during the interrogation. Likewise, a defendant's statement that he'd "rather" have an attorney has been held an unambiguous request for counsel. *See Ballard*, 420 Md. at 493–94 (suspect invoked right to counsel by stating "You mind if I not say no more and just talk to an attorney about this"); *see also State v. Harris*, 305 S.W.3d 482 (Mo. Ct. App. 2010) (suspect invoked right to counsel by stating "I'd rather appoint a lawyer"); *McDaniel v. Commonwealth*, 506 S.E.2d 21 (Va. Ct. App. 1998) (suspect invoked right to counsel by stating "I think I would rather have an attorney here to speak for me").

We view each statement through the lens of the reasonable officer, and ask what that officer would believe those statements to mean. In the course of considering what a reasonable officer would understand, though, we, like the officer, must take into account who is speaking and what his words reasonably meant to convey. *See Ballard*, 420 Md. at 493 ("But even if viewed not as a colloquialism but rather as having literal meaning, the import of the words is no different. Viewed from the perspective of a reasonable police officer in the position of Detective Kaiser, the most that could be said about Petitioner's words, 'You mind if I not say no more and just talk to an attorney about this,' is that Petitioner, though undoubtedly asking for an attorney, sought to couch the request in polite

19

or (more likely, given the context) deferential terms. In other words, to the extent that the phrase 'you mind if . . .' is understood as Petitioner genuinely posing a question, the only question he reasonably posed was whether Detective Kaiser 'mind[ed]' if Petitioner stopped talking and got an attorney."). Very rarely will courts be examining the words of attorneys or Fifth or Sixth Amendment experts, and detectives normally should be interpreting and understanding the common sense meaning of the words the defendant has said.

Now back to Mr. Vargas-Salguero. The condition "if you accuse me of something" in the first half of his statement had indisputably been met, at least in the way that a normal person—and a reasonable police officer—would consider himself "accused of something." At the time he made these statements, he had been arrested at his home in the middle of the night pursuant to an arrest warrant, issued by a court, that included serious crimes, and was being questioned in an interrogation room by three detectives. He mentioned (and lamented) several times that he felt like he could be going to jail for a crime he didn't commit. It doesn't matter for these purposes whether the charging documents had triggered his Sixth Amendment rights (we'll deal with those below), or that the detectives claimed that he wasn't being accused of anything. Maybe he "sought to couch [his] request [for an attorney] in polite or (more likely, given the context) deferential terms," *Ballard*, 420 Md. at 493, but he was there because he had been, and was being, accused of serious crimes.

With that condition met, Mr. Vargas-Salguero's statement that he'd "better want an attorney," the officers' translated understanding of his statement in Spanish, sufficiently invoked his desire for an attorney. Other cases have held "I think I want an attorney" or

"I'd rather have an attorney" was sufficient. *See, e.g.*, *Harris*, 305 S.W.3d at 489 (suspect invoked right to counsel by stating "I'd rather appoint a lawyer"); *McDaniel*, 506 S.E.2d at 23 (suspect invoked right to counsel by stating "I think I would rather have an attorney here to speak for me"). This statement was at least as strong as those.

Moreover, the testimony and actions of the detectives themselves demonstrated that Mr. Vargas-Salguero's request for counsel was sufficiently clear to them. Immediately following Mr. Vargas-Salguero's invocation, both detectives ceased asking questions and exited the room.

> A:    And I go to work. That's all I have to say to you. And if you accuse me of something I better want an attorney.
>
> DETECTIVE DELEON: We're not – okay.
>
> ***
>
> DETECTIVE BELLINO: Why are you so angry man?
>
> A:    No I'm not angry 'cause…I'm sorry, man.
>
> DETECTIVE BELLINO: We're not coming at you like that, man.
>
> A:    I'm sorry man. Forgive me.
>
> DETECTIVE BELLINO: Don't be angry, man.
>
> A:    That's the way I am, brother. I'm sorry I know you're not my brother, but that's the way I am. I'm sorry. Okay I'm not…
>
> DETECTIVE DELON: Okay. We'll be right back.

When they returned (as the video demonstrates and the transcript omits), Detective Bellino confirmed with Mr. Vargas-Salguero that he had requested an attorney a couple minutes ago, but suggested that he wanted to resume talking:

21

DETECTIVE DELEON: **Hold up, just a moment ago you said you wanted a lawyer** but you're willing to talk to us right now, right?[9]

A:      Yeah because I don't have no problem.

DETECTIVE DELEON: And you understand you have the right to remain silent, you understand you have the right to have an attorney, but you're willing to talk to us correct?

A:      I want to fix it. I want to fix it.

(Emphasis added). Then the detectives re-Mirandized Mr. Vargas-Salguero and picked back up with the questioning. The officers' words *and* actions—as reflected in the video, if not the transcript—revealed their understanding that Mr. Vargas-Salguero had asked for a lawyer.

The officers attempted at the hearing to create ambiguity, but their actions undermined their words. In his testimony at the hearing on the motion to suppress, Detective DeLeon characterized Mr. Vargas-Salguero's statement as "unclear," but nevertheless broke off the interview to consult with Detective Bellino:

> I better want an attorney, at that point, he doesn't say to me – that was very unclear of what he was asking. I wasn't sure and I was going to ask him, then he cut me off when I was going to ask him what did he mean by that…. *And I said to Detective Bellino, said, hey, I need to speak to you outside, because I was unsure and we could* – it happened so quick where I wasn't sure what he said. (emphasis added)

---

[9] This is not a situation where the detective was asking clarifying questions for the purpose of discerning Mr. Vargas-Salguero's intentions. *Cf. Berguis v. Thompkins*, 560 U.S. 370, 386-89 (2010).

And Detective Bellino testified that, after speaking with Detective DeLeon, he felt Mr. Vargas-Salguero's statement was close enough to a request for an attorney to re-advise him of his *Miranda* rights:

> I guess just prior to this point in the video, he made a statement in Spanish to Detective Deleon that was ambiguous – I mean essentially what I termed to be ambiguous although we don't have the benefit of rolling back the video to watch it. *So I proceeded cautiously and then re-advised him just to confirm that he understood his rights and was still willing to speak to us.*

(emphasis added).

Mr. Vargas-Salguero invoked his right to counsel, and once he did, the detectives were required to stop questioning him until an attorney was present. *Miranda*, 384 U.S. at 474 ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."). Instead, after the detectives returned and acknowledged that Mr. Vargas-Salguero had requested an attorney, they re-advised Mr. Vargas-Salguero of his Fifth Amendment rights and asked him to waive them, at the same time they laid on the table surveillance photos that appeared to depict him at the murder scene. *See Miranda*, 384 U.S. at 505 ("[T]hreats, tricks, or cajolings to obtain this waiver are forbidden."); *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to

23

him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

We have viewed the record from the suppression hearing in the light most favorable to the prevailing party. *Lee v. State*, 418 Md. 136, 148–49 (2011). And although we recognize that the State prevailed in the trial court, the detectives' decisions to pause the interview, re-enter the room, then re-administer the *Miranda* warning, after acknowledging that he had asked for a lawyer, demonstrate that Mr. Vargas-Salguero invoked his Fifth Amendment right to counsel with sufficient clarity. *Edwards*, 451 U.S. at 484–85. We hold that Mr. Vargas-Salguero invoked his Fifth Amendment right to counsel, and that the circuit court erred in denying his motion to suppress.

## 2. Mr. Vargas-Salguero also invoked his right to remain silent.

Mr. Vargas-Salguero also contends that he invoked his Fifth Amendment right to remain silent at two different points in the questioning. The *first* invocation occurred in the same statement we discussed above, when he said in Spanish, at approximately 30 to 35 minutes into the interview, "[t]hat's all I have to say to you. And if you accuse me of something I better want an attorney." Detective DeLeon responded, "We're not – okay." And then Mr. Vargas-Salguero continued speaking, stating that the officers should just put him in jail and he'd pay the time for somebody else's crime. After the detectives left the room for a few minutes, they returned and told Mr. Vargas-Salguero that they were willing to talk and re-advised him of his right to silence before they re-initiated questioning. In response, Mr. Vargas-Salguero told the officers to "[a]sk me whatever you want" because he wanted to "fix it."

24

*Second*, Mr. Vargas-Salguero argues that he invoked his right to silence approximately 10-15 minutes later when he said, in Spanish, "[i]n what moment did – did – I don't want to say anything else now. Because I have nothing else to say. I have nothing else to tell you. Me, killing a poor man." The video of the interview shows him flicking away the surveillance photos and leaning back in his chair. Detective DeLeon did not translate this statement for Detective Bellino, but pushed back from the table to give Detective Bellino room to lean toward Mr. Vargas-Salguero and ask him if he still wanted to talk:

> DETECTIVE BELLINO: **Look, are you willing to talk? I thought you said you didn't want to talk to us.**[10] Do you want to talk to me? Are you willing to talk to me?
>
> A: Yeah.
>
> DETECTIVE BELLINO: All right because, you know. Here's the thing, first of all, you want to talk to me I'll repeat everything I have already explained to you, you have the right to a lawyer, you have the right to remain silent, you're willing to speak to me, is that right?
>
> A: Yeah because I don't have any.

In both instances, the detectives re-initiated questioning after the statements by re-advising Mr. Vargas-Salguero of his *Miranda* rights.

We apply the same standard for an invocation of silence as we do an invocation of counsel: the statement either invoked the right or it didn't. *In re Darryl P.*, 211 Md. App 112, 169 (2013) ("The right to silence is invoked in precisely the same way that the right

---

[10] Again, the bolded text represents the words actually spoken during the interrogation, as demonstrated by the video, but left out of the transcript prepared by the police.

to counsel is invoked. The right to counsel is waived in precisely the same way that the right to silence is waived. The common invocation procedure, moreover, applies in the pre-waiver context precisely as it does in the post-waiver context."). No specific combination of words is required, but the invocation must be unambiguous. *See Williams v. State*, 219 Md. App. 295, 326 (2014), *aff'd*, 445 Md. 452 (2015) ("As the State conceded below, the isolated statement 'I don't want to say nothing' would be unambiguous"); *see also People v. Arroya*, 988 P.2d 1124, 1133 (Colo. 1999) ("I don't wanna talk no more" held to be an unambiguous invocation); *Ballard*, 420 Md. at 491 ("You mind if I not say no more and just talk to an attorney about this" unambiguously invoked suspect's right to counsel); *Law v. State*, 21 Md. App. 13, 36–37 (1974) (suspect's statement that "*he didn't want to talk anymore*" qualified as an unambiguous invocation). We judge the statement's ambiguity by what a reasonable officer in those circumstances would have thought the statement to mean, *Williams*, 219 Md. App. at 327, an objective inquiry. *Ballard*, 420 Md. at 490.

In the first invocation, Mr. Vargas-Salguero argues that the detectives should have stopped questioning after he said, "[t]hat's all I have to say to you." This statement immediately preceded his proper invocation of his right to an attorney and, as we discussed above, questioning should have ceased at that point. Therefore, when we also consider the "totality of the circumstances surrounding the interrogation," *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), we find that Mr. Vargas-Salguero invoked his right to silence as well.

He also invoked his right to silence in his second request. And it's hard to imagine how he could have been clearer: he said "I don't want to say anything else now. Because I have nothing else to say. I have nothing else to tell you," while flicking away the

26

surveillance photos, leaning back in his chair, and disengaging from the questioning. The questioning continued only after Detective Bellino re-engaged him and re-advised Mr. Vargas-Salguero of his *Miranda* rights.

In both instances, the detectives re-advised Mr. Vargas-Salguero of his *Miranda* rights before they re-initiated the interrogation, which was improper. *Edwards*, 451 U.S. at 484–85 ("[W]hen an accused has invoked his right [] during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). And because the detectives re-initiated the questioning, Mr. Vargas-Salguero did not waive his right to remain silent when he answered their questions. *See Raras v. State*, 140 Md. App. 132, 153 (2001); *Davis*, 512 U.S. at 458. Again, "when placed in context with the other statements that he had made in the interrogation room up to that point," *Williams*, 219 Md. App. at 327, we hold that Mr. Vargas-Salguero invoked his Fifth Amendment right to silence, and that the circuit court erred when it denied his motion to suppress.

### 3. Admitting the statements was not harmless error.

Having concluded that Mr. Vargas-Salguero's Fifth Amendment rights were violated, we look at whether the admission of Mr. Vargas-Salguero's statements contributed to his conviction. *Chapman v. California*, 386 U.S. 18, 25–26 (1967). And there is no question that they did.

27

> A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139–40 (1968)). In this case, Mr. Vargas-Salguero's partial confession that he had gotten into an altercation with the victim and stolen his phone on the night of the murder undoubtedly affected the outcome of his conviction. And because the errors weren't harmless, we reverse the judgment of the circuit court and remand for further proceedings.

### B. Mr. Vargas-Salguero's Sixth Amendment Rights Had Not Attached.

*Next*, Mr. Vargas-Salguero claims that his Sixth Amendment right to an attorney was violated when, after making the same statement we discussed above,[11] the detectives continued to question him without an attorney present. Because he was under arrest and, he claims, already formally charged at the time of this statement, he contends that this statement triggered his Sixth Amendment right to counsel. The State responds that this issue was not preserved for review by this Court, but that, even if it were, the Sixth Amendment was not triggered by Mr. Vargas-Salguero's arrest.

We can dispose quickly of the State's preservation argument: in the supplement to his motion to suppress, Mr. Vargas-Salguero argued in paragraphs 17 and 18 that "the State

---

[11] "Si me acusan de eso, quiero un abogado mejor."

28

violated [his] rights under the Fifth *and Sixth* Amendments to the United States Constitution . . . to have counsel present at all critical stages of the criminal process[.]" (emphasis added). So the State and the trial court were on notice, and had an opportunity to respond to Mr. Vargas-Salguero's objections under both Amendments.

That said, we agree with the State that Mr. Vargas-Salguero's Sixth Amendment rights had not yet attached. The Sixth Amendment guarantees criminal defendants facing incarceration the right to counsel at all "critical stages," *Adams v. State*, 192 Md. App. 469, 480 (2010), when "adversar[ial] judicial proceedings have been initiated." *United States v. Gouveia*, 467 U.S. 180, 188 (1984). This right is generally triggered by "indictment, information, other formal charge[s], arraignment, or preliminary hearing." *Webster v. State*, 299 Md. 581, 611 (1984). A warrant of arrest and statement of charges may be considered a "formal charge . . . when a defendant is subject to be tried on that document." *State v. Gee*, 298 Md. 565, 574 (1984). In Maryland, however, charges for "felonies within the circuit court's exclusive jurisdiction" will trigger Sixth Amendment protections only when the State has "commit[ted] to prosecution . . . [and] obtain[ed] an indictment from a grand jury or file[d] a criminal information." *White v. State*, 223 Md. App. 353, 279 (2015); *see also* MD. CODE ANN., CTS. & JUD. PROC. § 4-302(a).

Mr. Vargas-Salguero's Sixth Amendment rights had not yet vested at the time of his arrest. His arrest warrant and statement of charges were signed for murder and armed robbery, both felonies within the exclusive jurisdiction of the circuit court. MD. CODE ANN., CRIM. LAW § 2-201; § 3-403 (b); MD. CODE ANN., CTS. & JUD. PROC. § 4-302 (a) ("[T]he District Court does not have jurisdiction to try a criminal case charging the

commission of a felony."); *see also McBurney v. State*, 280 Md. 21, 31 (1977) ("With respect to the subject matter, within its county, a circuit court of this state has full common law jurisdiction in all criminal cases committed in Maryland except where limited by law. Maryland Code (1974), Courts and Judicial Proceedings Article, § 1-501."). Therefore, it was not until Mr. Vargas-Salguero was charged by criminal indictment with murder, armed robbery, and carrying a dangerous weapon openly with intent to injure on October 30, 2014 that his Sixth Amendment rights vested. *White*, 223 Md. App. at 379.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PRINCE GEORGE'S COUNTY TO PAY COSTS.**